**THE HUFF ENERGY FUND, L.P., WRH Energy Partners, L.L.C., William R. "Bill" Huff, Rick D'Angelo, Ed Dartley, Bryan Bloom, and Riley-Huff Energy Group, LLC, Appellants**

v.

**LONGVIEW ENERGY COMPANY, Appellee**

No. 04–12–00630–CV

Court of Appeals of Texas, San Antonio.

Delivered and Filed: November 25, 2015.

Dean V. Fleming, Michael W. O'Donnell, Fulbright & Jaworski L.L.P., Sharon E. Callaway, Crofts & Callaway, P.C., Ricardo R. Reyna, Brock Person Guerra Reyna, P.C., Jeffrey Webb, San Antonio, TX, Thomas R. Phillips, Matthew C. Wood, Baker Botts, L.L.P., Pamela Stanton Baron, Attorney at Law, Austin, TX, Daryl L. Moore, Daryl L. Moore, P.C., Houston, TX, for Appellants.

Mikal C. Watts, Francisco Guerra IV, Edward W. Allred, Watts Guerra & Craft, L.L.P., Brian P. Berryman, Watts Law Firm, L.L.P., San Antonio, TX, Craig B. Florence, Stacy R. Obenhaus, Rachel Kingrey, Randy D. Gordon, Gardere, Wynne, Sewell, L.L.P., Dallas, TX, Claudio Heredia, Rolando M. Jasso, Knickerbrocker, Heredia, Jasso & Stewart, P.C., Eagle Pass, TX, for Appellee.

Sitting en banc: Sandee Bryan Marion, Chief Justice, Karen Angelini, Justice, Marialyn Barnard, Justice, Rebeca C. Martinez, Justice, Patricia O. Alvarez, Justice, Luz Elena D. Chapa, Justice, Jason Pulliam, Justice

## OPINION

Opinion by: Sandee Bryan Marion, Chief Justice

In the underlying lawsuit, appellee, Longview Energy Company ("Longview"), sued two of its directors and others for, among other claims, breach of fiduciary duty by taking a corporate opportunity that belonged to Longview. Following a jury trial, several liability questions were submitted to the jury. The two liability questions addressed in this opinion asked whether either of the directors (1) failed to comply with his fiduciary duty to Longview by taking a corporate opportunity

and (2) failed to comply with his fiduciary duty of loyalty by improperly engaging in competition with Longview. The jury answered affirmatively to both questions, as well as affirmatively to other questions that held all the defendants liable. The trial court awarded Longview $95.5 million in monetary disgorgement and imposed a constructive trust on a variety of assets owned by one of the defendants. On appeal, appellants, the defendants below, all raise—in addition to other issues—legal sufficiency challenges to the evidence in support of the liability findings. Because we conclude the evidence is legally insufficient to support the jury's finding on the corporate opportunity question and because we conclude Longview did not plead a competition cause of action, we reverse and render a take-nothing judgment in favor of appellants.

## BACKGROUND

The defendants below and appellants here are two of Longview's directors, William R. "Bill" Huff and Rick D'Angelo. The other defendants/appellants are The Huff Energy Fund, L.P. ("HEF"), WRH Energy Partners, L.L.C., and Riley–Huff Energy Group, LLC ("Riley–Huff Energy").[1] At the center of this dispute are leases in the Eagle Ford shale, an oil and gas formation encompassing thirteen million acres in South Texas.

Longview is an oil and gas company. In 2006, HEF purchased stock in Longview, which entitled HEF to appoint Bill Huff and Rick D'Angelo to Longview's board of directors. Bill Huff is the head of HEF and Rick D'Angelo evaluated potential energy investments for HEF. Sometime in 2009, HEF and Bobby Riley formed Riley–Huff Energy. In mid–2009, HEF encour-

aged its portfolio companies, including Longview, to explore investment opportunities in the Eagle Ford.

On September 10, 2009, representatives of both HEF and Longview met in New Jersey to discuss investment strategies for Longview, including the Eagle Ford shale. According to Longview, it was at this meeting that Bill Huff agreed to fund any investment "that Rick Pearce likes." Pearce is Longview's chief operating officer and senior petroleum engineer. Over the next several months Longview's management investigated opportunities in the Eagle Ford shale. Longview commissioned an Eagle Ford shale study from consulting geologist/geophysicist Mark Lober. At the time, Lober had been consulting with Pat Gooden, an Eagle Ford land broker, on another deal. Gooden, in turn, had been working with another Eagle Ford land broker, Tamara Ford, who operated under the name Wyldfire Energy. Longview's management later met with Gooden and Ford to discuss Eagle Ford leases. At Longview's first meeting with the land brokers on December 2, 2009, neither Gooden nor Ford presented any specific leases to Longview. Instead, Ford drew circles on a map of various counties to indicate general areas where acreage/leases were available.

On December 17, 2009, Longview's management, Lober, and D'Angelo met to discuss Lober's geological findings, Longview's economic plans, development of the Eagle Ford acreage, and the land brokers. On December 21, 2009, Longview's management had its second meeting with the land brokers. New circles, or "blobs," were added to the maps, but no specific leases were identified. At about this same

1. Two other defendants were Ed Dartley and Bryan Bloom. The trial court's judgment ordered Longview to take nothing of and from Bloom and Dartley, and this portion of the judgment was not challenged on appeal.

time, Ford was also meeting with Bill Riley. Throughout the remainder of December 2009 and into early January 2010, Longview's management and D'Angelo continued to discuss Lober's work and various maps.

Longview's management ultimately decided to present an investment proposal to its board of directors at the board's January 28, 2010 board meeting. In advance of this meeting, Bob Gershen, Longview's president and CEO, distributed reading materials to the directors. These materials included a proposed strategy for investing in the Eagle Ford and economic projections. At the board meeting, Rick Pearce presented Longview's plan to invest $40 million—to be acquired from Huff—to purchase 20,000 Eagle Ford acres. The maps shown to the board, acquired from Ford and Gooden, showed available acreage but not specific leases within the acreage. After the presentation, the board did not vote on the proposal because, according to Longview, D'Angelo said Huff would not support an investment in Eagle Ford trend acreage. During a subsequent investigation, Longview's management learned that three days before the January 28 board meeting, Riley–Huff Energy signed a contract with Wyldfire to purchase some of the same acreage Longview was considering buying through the same land brokers. This contract was not mentioned at the January 28 board meeting. After not receiving Huff's investment, and after considering other funding options and conducting additional board meetings on February 1 and February 5, 2010,

Longview took no further action on its Eagle Ford investment plan. In the meantime, Riley–Huff Energy acquired approximately 44,698 Eagle Ford acres for its own use.

Longview sued raising a variety of claims: (1) breach of fiduciary duty/usurpation of corporate opportunity against Huff and D'Angelo; (2) fraud against all defendants; (3) tortious interference with prospective business relationships against all defendants; (4) misappropriation of trade secrets against all defendants; (5) aiding and abetting against all defendants; and (6) conspiracy against all defendants. Ultimately, only two liability questions were submitted to the jury: (1) did Huff and/or D'Angelo fail to comply with their fiduciary duty to Longview by taking a corporate opportunity; and (2) did Huff and/or D'Angelo fail to comply with their fiduciary duty of loyalty to Longview by engaging in competition with Longview without the informed approval of Longview's board.[2] The jury answered "yes" to the questions. The trial court rendered judgment in favor of Longview, and awarded Longview a constructive trust of various assets owned by Riley–Huff Energy as well as a $95 million monetary award.

## STANDARD OF REVIEW

Appellants, who did not have the burden of proof at trial, all raise legal sufficiency challenges to the evidence. "A party will prevail on its legal-sufficiency challenge of the evidence supporting an adverse finding on an issue for which the opposing party

---

**2.** Other questions were also submitted regarding whether Riley–Huff Energy and/or The Huff Energy Fund LP knowingly participated in Huff's and/or D'Angelo's failure to comply with their fiduciary duty (the aiding/abetting claim); and whether Riley–Huff Energy wrongfully obtained assets in the Eagle Ford shale as a result of Huff's and/or D'Angelo's failure, if any, to comply with their fiduciary duty. Longview did not submit its claims for fraud, tortious interference with prospective business relationships, misappropriation of trade secrets, and conspiracy to the jury.

bears the burden of proof if there is a complete absence of evidence of a vital fact or if the evidence offered to prove a vital fact is no more than a scintilla." *Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex.2014); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex.2005). "More than a scintilla exists when the evidence as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions." *Waste Mgmt. of Texas*, 434 S.W.3d at 156; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). "However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence." *Waste Mgmt. of Texas*, 434 S.W.3d at 156. In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the judgment, crediting evidence that a reasonable fact finder could have considered favorable and disregarding unfavorable evidence unless the reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 807. We indulge every reasonable inference that supports the trial court's findings. *Id.* at 822. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

## JURY QUESTION NUMBER ONE

■ The jury was first asked whether Bill Huff and Rick D'Angelo failed to comply with their "fiduciary duty to Longview Energy Company by taking a corporate opportunity." Specifically, the jury was asked as follows:

> Did [Bill Huff and/or Rick D'Angelo] fail to comply with his fiduciary duty to Longview Energy Company by taking a corporate opportunity?

Because they are Longview Energy Company directors, Bill Huff and Rick D'Angelo owe fiduciary duties to Longview Energy Company with respect to corporate opportunities.

A Longview Energy Company director may *not* take a corporate opportunity for himself if:

(1) Longview Energy Company had an interest or a reasonable expectancy in the opportunity;

(2) Longview Energy Company was financially able to pursue the opportunity;

(3) the opportunity was within Longview Energy Company's line of business; *and*

(4) the director diverted the business opportunity to another and thus brought the director's interests into conflict or competition with Longview Energy Company's interest.

A Longview Energy Company director *may* take a corporate opportunity for himself if:

(1) the business opportunity is first presented to the director in his individual and not his corporate capacity;

(2) the opportunity is not essential to the corporation;

(3) the corporation does not have an interest or expectancy in the business opportunity; *and*

(4) the director has not wrongfully employed the resources of the corporation pursuing the opportunity.

[Emphasis added.]

As the first part of this question was phrased, to hold Huff and/or D'Angelo liable for taking a corporate opportunity, the jury was required to make affirmative implied findings on all of the first four factors relevant to when a director may *not* take a corporate opportunity. Because the jury answered "yes" as to both Huff and D'An-

gelo, the jury impliedly found that (1) Longview had an interest or a reasonable expectancy in the opportunity; (2) Longview was financially able to pursue the opportunity; (3) the opportunity was within Longview's line of business; and (4) the director diverted the business opportunity to another and thus brought the director's interests into conflict or competition with Longview's interest.

On appeal, Huff and D'Angelo assert there is legally insufficient evidence that they breached their fiduciary duty to Longview by usurpation of corporate opportunity because (1) Longview had no actual, cognizable interest or expectancy in any specific property, but only "a self-labeled 'hypothetical' plan to invest in" the Eagle Ford; (2) the idea to invest in the Eagle Ford originated from Huff and D'Angelo in their investment management roles at HEF and thus was not presented to them as directors of Longview; (3) Longview did not have the financial ability to "fund its 'hypothetical' plan," and neither HEF, Huff, nor D'Angelo had a duty to fund Longview's investments; (4) Longview's board voted to reject the opportunity to invest in the Eagle Ford; and (5) there is no evidence that Huff or D'Angelo personally benefitted from or took an opportunity for himself. Huff and D'Angelo also argue they were not required to establish the first four factors relevant to when a director may not take a corporate opportunity because there is a threshold legal question of whether a corporate opportunity existed. Based on this argument, Huff and D'Angelo contend that because there was no corporate opportunity to be taken in this case, there is no reason for this court to examine the four factors set forth in question number one.

An appellate court must measure the sufficiency of the evidence by the jury charge as it was submitted. *Romero v. KPH Consol., Inc.,* 166 S.W.3d 212, 221 (Tex.2005); *Oliva v. Davila,* 373 S.W.3d 94, 101 (Tex.App.—San Antonio 2011, pet. denied). Therefore, we do not review the evidence to determine whether a corporate opportunity did, in fact, exist. Instead, we review the evidence to determine only whether legally sufficient evidence supports the jury's four implied findings as stated in question number one. Because we conclude the evidence is legally insufficient to support the first implied finding, which is dispositive of this liability issue, this opinion discusses only whether Longview "had an interest or a reasonable expectancy in the opportunity." *See* Tex. R. App. P. 47.1.

Longview is a Delaware corporation, and the parties agree Delaware's corporate opportunity law governs Huff's and D'Angelo's liability.[3] The seminal Delaware corporate opportunity case—which all parties and the trial court recognize—is *Guth v. Loft, Inc.,* 23 Del.Ch. 255, 5 A.2d 503, 510–11 (1939), in which the Delaware Supreme Court held that

> the rule of corporate opportunity, is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents.

> It is true that when a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it

---

**3.** At trial, Appellants filed an unopposed Rule 202 Motion to Take Judicial Notice of Delaware Law. *See* Tex. R. Evid. 202. During oral argument in this court, the parties agreed Delaware law was applicable to the substantive issues.

has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it, if, of course, the officer or director has not wrongfully embarked the corporation's resources therein.

◼ Whether a director of a corporation is duty bound to acquire a business opportunity for the corporation, or to refrain from acquiring the opportunity for himself, depends upon whether the corporation has an interest, actual or in expectancy, in the opportunity, or whether the acquisition of the opportunity by the director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created. *See Johnston v. Greene*, 35 Del.Ch. 479, 121 A.2d 919, 923–24 (1956) (citing *Colorado & Utah Coal Co. v. Harris*, 97 Colo. 309, 49 P.2d 429 (Colo.1935)). For the corporation to have an actual or expectant interest in the opportunity, there must be some tie between the opportunity and the nature of the corporate business. *See id.* at 924.

In this case, there is a close tie between the nature of the Eagle Ford opportunity and the nature of Longview's business as an oil and gas exploration and production company. However, the inquiry does not end here. The next considerations are whether Longview had an interest, actual or in expectancy, in the Eagle Ford opportunity, or whether the purchase of the property by the director might hinder or defeat Longview's plans and purposes in the carrying on or development of the legitimate business for which it was created. *Id.* at 923–24. There is no dispute that Longview did not have an actual existing property right in the Eagle Ford opportunity. Therefore, as to the first consideration, the inquiry is narrowed to whether Longview had an *expectancy* in the opportunity.

Longview is an oil and gas exploration and production company. Eagle Ford is what is known as "a resource play or a source rock play," meaning it is the source of oil and gas. Longview had explored the Eagle Ford as an investment opportunity prior to the September 10, 2009 meeting with Bill Huff and Rick D'Angelo. Longview's vice president, David Fuller, testified Longview had been aware of Eagle Ford for many years and knew it could produce oil and gas, but at the time, it was not economically feasible to get the oil and gas out of the ground—that is, until technology changed, and horizontal drilling and fracking made production feasible. Fuller testified that in December 2009 the average price for Eagle Ford acreage was $1,000 per acre and, if Longview had been able to raise $40 million, Longview would have obtained roughly 40,000 acres.

Rick Pearce testified the planned proposal to the Longview board of directors was to acquire 3,000 acres in seven prospects, a total of 21,000 acres, at an estimated capital cost of $40 million. Pearce explained Longview needed acreage blocks large enough to drill horizontally, but he did not want to purchase "one large chunk of acreage somewhere." Instead, he wanted to buy acreage spread across the "trend." Pearce explained "trend acreage" as "if a new trend has started—for instance, if somebody has found a new reservoir that will produce, one that hasn't produced in the past, then you try to get out in front of that. From your knowledge of regional geology, you try to predict best where that reservoir [is] or where the potential for that reservoir is going to be and you buy acreage out in front of it before it becomes a hot play and gets all leased up." Pearce testified Longview prepared two economic scenarios: one in

which Longview purchased 100% of the 21,000 acres and then brought in an industry partner, and a second scenario in which Longview would begin with an industry partner and purchase the acreage on a fifty-fifty basis.

The land brokers with whom Longview worked indicated they had available land in the Eagle Ford trend, referred to as "blobs." When asked why the land brokers did not identify a specific lease or provide a specific property description, Pearce replied that unscrupulous people would take that information and contact the owner directly, thereby cutting the land broker out of the purchase. Pearce said he was comfortable that the land brokers could get specific property if Longview wanted to purchase acreage immediately. When asked if the brokers were offering Longview specific property, Pearce replied "Defined well enough within the fairways of the Eagle Ford, yes."

This evidence shows Longview wanted to invest in the Eagle Ford shale, spent time and money investigating investment opportunities in Eagle Ford property, and entered into discussions with land brokers about the availability of oil and gas property to acquire. But the question is whether these actions rise to the level of an "expectancy" in an opportunity. We conclude it does not. Instead, the evidence shows only that Longview had been, "in a general way, 'negotiating for and endeavoring to purchase' the interests involved." *Colorado & Utah Coal Co.*, 49 P.2d at 431.

One of the cases on which the *Guth* court relied for its holding that a corporate director may take an opportunity for his own if, among other things, the corporation had no interest or expectancy in the opportunity was *Colorado & Utah Coal Co.* In that case, the corporation was a coal company, and the suit was for the purpose of impressing a trust upon coal lands acquired by its president, who was also a director, in his individual capacity. There was evidence the corporation had investigated and considered these same coal properties, together with other coal properties. Nevertheless in holding that a corporate opportunity had not been established, the Colorado Supreme Court stated:

> ...These parties are operating in a territory containing coal deposits of vast, we might almost say of unlimited, extent. Such is the condition of this record as to force the conclusion that, if plaintiff had an interest in expectancy in the property in question, it had a virtual monopoly of extensive fields into which its officers and directors were forever precluded from entering. We find in the authorities, and in reason, no support for such an extension of the doctrine of expectancy.

*Id.*

The same can be said here. The Eagle Ford shale encompasses millions of acres across thousands of miles. And, there is no dispute that the availability of land rapidly changed as other oil and gas companies also pursued Eagle Ford investment opportunities. The evidence is undisputed that Riley–Huff Energy began acquiring Eagle Ford property for itself as early as September 2009, which the trial court did not consider wrongfully obtained.[4] There is no dispute that Longview wanted to invest in the Eagle Ford shale. Longview claims its opportunity was "a concept [to] acquire 21,000 acres[,]

4. The trial court expressly excluded from the constructive trust "those leases acquired by Riley–Huff pursuant to the 'BGE' transaction and the 'Maali' transaction, as set forth on exhibit B attached hereto and made a part hereof, and any associated wells, rights and other property interests."

which would be expanded to 'roughly 40,-000 acres' ... and then drill one well per tract to 'prove up' the leased area's oil-producing capability," "a proprietary strategy for investing in Eagle Ford," and an "interest in investing in a resource play." But, to characterize this concept, strategy, and interest in investing as an "expectancy" would give Longview "a virtual monopoly of extensive fields into which its officers and directors were forever precluded from entering." *Id.*

Also, an opportunity must be something more than a desire to invest—especially when the investment is in an area as large as the Eagle Ford shale. In *Johnston*, the Delaware Supreme Court addressed the chancellor's finding that a corporation's need for investments constituted an interest in the opportunity to acquire a specific business entity:

> ... Now, this is an application of the rule of corporate opportunity that requires careful examination. It is one thing to say that a corporation with funds to invest has a general interest in investing those funds; it is quite another to say that such a corporation has a specific interest attaching in equity to any and every business opportunity that may come to any of its directors in his individual capacity. This is what the Chancellor appears to have held. Such a sweeping extension of the rule of corporate opportunity finds no support in the decisions and is, we think, unsound.

*Johnston*, 121 A.2d at 924.

Again, the same can be said here. There is no dispute Longview wanted to invest in the Eagle Ford and devoted extensive resources to developing an investment strategy. And, although we agree with Longview's argument on appeal that business opportunities "often consist of complex ideas, strategies, and transactions that can only be executed ... over a peri-od of time," the opportunity must be something more than a concept or strategy. To conclude Longview had an expectancy in a loosely-defined "strategy" would effectively preclude Longview's directors from investing in "any and every business opportunity that may" arise in the Eagle Ford shale. *Id.*

Finally, we must ask whether Riley–Huff Energy's purchase of the Eagle Ford property hindered or defeated Longview's plans and purposes. Both the Delaware Supreme Court in *Johnston* and the Colorado Supreme Court in *Colorado & Utah Coal Co.* held that one of the considerations in whether a corporate director is duty bound to refrain from purchasing property for himself depends upon whether the purchase of the property by the director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created. *Johnston*, 121 A.2d at 923–24; *Colorado & Utah Coal Co.*, 49 P.2d at 430.

The same weakness that underscores Longview's arguments above applies here. Because Longview's own description of its opportunity is that it was a strategy or interest in investing "in a resource play," we do not believe Riley–Huff Energy's acquisition of acreage in the Eagle Ford hindered or defeated Longview's plan to also acquire acreage in the Eagle Ford. This is particularly true given the fact that the availability of Eagle Ford leases spread over millions of acres and thousands of miles, and several oil and gas companies other than Longview and Riley–Huff Energy were in competition for leases in the Eagle Ford.

For these reasons, we conclude the evidence is legally insufficient to support the jury's implied finding that Longview "had an interest or a reasonable expectancy in the opportunity." Because the evidence is

legally insufficient to support one of the four implied findings the jury was required to make, the judgment cannot be affirmed on the grounds that Huff and D'Angelo failed to comply with their "fiduciary duty to Longview Energy Company by taking a corporate opportunity." [5]

### JURY QUESTION NUMBER TWO

The jury was next asked whether Bill Huff and Rick D'Angelo failed to comply with their fiduciary duty of loyalty to Longview Energy Company by engaging in competition with Longview without the informed approval of Longview's board of directors. The jury was instructed that a Longview "director fails to comply with his fiduciary duty of loyalty to [Longview] if he engages in competition with [Longview] without the informed approval of [Longview's] board of directors." The jury answered "yes" as to both Huff and D'Angelo. On appeal, Huff and D'Angelo assert (1) under Delaware law, competition by itself will not independently support breach-of-fiduciary-duty liability and (2) Longview failed to plead a cause of action for competition separate from its usurpation of a corporate opportunity cause of action. We agree Longview did not plead a separate cause of action for competition; therefore, we do not address whether Delaware law supports such a cause of action. *See* Tex. R. App. P. 47.1.

We review a trial court's decision to submit a jury question or instruction under an abuse of discretion standard. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex.2000). "A clear abuse of discretion exists when the trial court submits a jury question that is neither supported by the pleadings nor tried by consent." *Crowson v. Bowen*, 320 S.W.3d 486, 488 (Tex.App.—Fort Worth 2010, no pet.); *Stephanz v. Laird*, 846 S.W.2d 895, 902 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

"Jury questions must be supported by the pleadings." *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 380 (Tex.App.—Dallas 2009, no pet.); *see also* Tex. R. Civ. P. 278 ("The court shall submit the questions, instructions, and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."). "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tex. R. Civ. P. 67. However, "written pleadings, before the time of submission, shall be necessary to the submission of questions...." *Id.*; *see also Gibbins v. Berlin*, 162 S.W.3d 335, 342 (Tex.App.—Fort Worth 2005, no pet.). Trial by consent does not occur where the complaining party properly objects to the submission of issues not raised by the pleadings. *Harkey v. Tex. Employers' Ins. Ass'n*, 146 Tex. 504, 509, 208 S.W.2d 919, 922 (1948). "Certainly issues are not tried merely by the hearing of the testimony thereon; submission to the jury undoubtedly is part of the process. So, although the complaining party does not object to the testimony on the issues but does object to their submission on some tenable ground, he cannot be regarded as impliedly consenting that they be tried when not raised by the pleadings, as contemplated by Rule 67." *Id.* In this case, appellants objected to the submission of jury question number two on the ground that it was not supported by the pleadings;

---

5. Because we conclude the evidence is legally insufficient to support the first implied finding that Longview "had an interest or a reasonable expectancy in the opportunity," we do not address the sufficiency of the evidence in support of the remaining implied findings under jury question number one.

therefore, the issue was not tried by consent.

There is no contention by Longview that it expressly or specifically stated in its last live petition that it was raising a "competition" claim. Instead, Longview asserts it pled the claim because "competition" was a "pervasive theme" in its petition. A pleading should contain "a short statement of the cause of action sufficient to give fair notice of the claim involved...." TEX. R. CIV. P. 47(a). When, as here, special exceptions are not filed, we construe the petition liberally in favor of the pleader. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex.1982). We will uphold the petition as to a cause of action that may be reasonably inferred from what is specifically stated, even if an element of the cause of action is not specifically alleged. *See id.* In determining whether a pleading is adequate, we examine whether an opposing attorney of reasonable competence, on review of the pleadings, can ascertain the nature and the basic issues of the controversy. *Bowen v. Robinson*, 227 S.W.3d 86, 91 (Tex.App.—Houston [1st Dist.] 2006, pet. denied).

To determine whether Longview's petition gave fair notice of a breach of fiduciary duty by competition claim, we turn first to the "Factual Background" section of the petition. In the "Relationship of the Parties" subsection of the petition, Longview contended that three of the defendants—D'Angelo, Dartley, and Bloom—held positions with HEF portfolio companies that were "direct competitors of Longview," one of which was Riley–Huff Energy. Longview characterized Riley–Huff Energy as a "direct competitor of Longview." In the "The Scheme and Its Roots" subsection, Longview stated as follows:

Longview diligently educated its Directors concerning their duties of loyalty to the company. These duties demand absolute fidelity to Longview's interests and require an extra measure of diligence when a director may have divided interests by, for instance, simultaneously serving as a director, officer, partner, investor or manager of entities *in competition with Longview.* Accordingly, in 2007, Longview distributed a guidance letter prepared by its corporate counsel [that] cautioned *"[i]f an investor opposes or favors, out of its own economic self-interest and not necessarily that of the corporation, an action being considered by the corporation, it should express that position in its capacity as a stockholder of the corporation ... and not as a director."* [Emphasis added.]

Longview next referred to a letter sent on the eve of the January 28 board meeting from WRH Energy to Longview, which

did not disclose that the Huff parties had decided to pursue Eagle Ford opportunities through Riley–Huff and its other portfolio companies rather than Longview, nor that it already had negotiated a contract with Ford's company, Wyldfire. *Accordingly, the letter is plainly a pretext designed to obscure the decision to hijack Longview's valuable Eagle Ford opportunity.* Moreover, the inherent conflict ignored by Huff and his minions was that—although their control of multiple portfolio companies in the energy sector allowed them the luxury of covering losses in many of these companies with a bonanza in one company—Longview rises and falls according to its individual performance. In other words, Longview had duties to all its shareholders, not just to Huff Energy; it made a great difference to those Longview shareholders whether an Eagle Ford payday wound up in Longview rather

than inside another Huff portfolio company. [Emphasis added.]

Longview next alleged:

Soon after execution of its January 25, 2010 agreement with Wyldfire, Huff Energy's majority-owned portfolio companies embarked on an ambitious investment program in the Eagle Ford acres previously presented to Longview, ultimately pouring millions of dollars into lease acquisitions and drilling wells on these very properties. *Riley–Huff ultimately acquired through Wyldfire thousands of acres first identified and targeted by Longview and it obtained tens of thousands of acres from other sources. Contrary to their fiduciary duties to Longview, neither Huff nor D'Angelo ever presented these opportunities to Longview or its Board.* [Emphasis added.]

Finally, Longview alleged that

[b]y as early as April 2010, Huff Energy had dumped almost $40 million into Riley–Huff s Eagle Ford play, which—by no coincidence—was exactly what Longview had proposed to do only weeks earlier to its Board (and to Huff and D'Angelo as Directors). *Huff Energy took this investment tack for its own benefit* because it would reap nearly 100% of the value from investments made through its majority owned and controlled companies, whereas it would gain only a fraction of any profits from an investment made through independently owned and managed Longview. This, of course, flatly contravened Huff and D'Angelo's strict duty of loyalty to Longview, which prohibited them from exploiting business opportunities that fairly belonged to Longview and required them to present such opportunities to Longview before exploiting them for their own self-interests. Their usurpation is all the more egregious because

Huff and D'Angelo (aided by their cohorts) acted under the cloak of their directorships and acted not only surreptitiously but implemented their scheme through the misuse of confidential, proprietary corporate information supplied by Longview [Emphasis added.]

The next section of the petition stated the "Claims" asserted by Longview. Under the claim entitled "Breach of Fiduciary Duty/Usurpation of Corporate Opportunity (Against Huff and D'Angelo)," Longview alleged

55. D'Angelo and Huff owe Longview a duty of loyalty.

56. Longview was financially able to exploit the Eagle Ford opportunity.

57. The Eagle Ford opportunity was within Longview's line of business.

58. Longview had an interest or expectancy in the Eagle Ford opportunity.

59. *By diverting the Eagle Ford opportunity to themselves, D'Angelo and Huff placed themselves in a position of conflict or competition with Longview.*

60. D'Angelo and Huff breached their fiduciary duties to Longview by usurping the Eagle Ford opportunity and misusing proprietary information supplied by Longview in regard to the Eagle Ford [Emphasis added.]

This "Breach of Fiduciary Duty/Usurpation of Corporate Opportunity (Against Huff and D'Angelo)," section set forth the same elements the jury later considered injury question number one instructing the jury when a Longview director "may *not* take a corporate opportunity for himself."

The petition also included specific "Claims" subsections for "Fraud," "Tortious Interference with Prospective Business Relationships," "Misappropriation of Trade Secrets," "Aiding and Abetting," and "Conspiracy." However, as we have already noted, although there was a specif-

ic "Claims" subsection for breach of fiduciary duty based on usurpation of corporate opportunity, there was no specific "Claims" subsection for breach of fiduciary duty based on unapproved competition.

After reading the petition in its entirety and construing the petition liberally in favor of Longview, we conclude the petition did not give fair notice to appellants of a separate competition claim. It is true the petition characterized Riley–Huff Energy as a competitor of Longview and contended Longview educated its directors on their duty of loyalty especially when the director served in a position with another entity that competed with Longview. But, any reference to competition was in connection with its claim of usurpation. The factual allegations spoke in terms of a director considering or appropriating an opportunity that belonged to Longview: (1) what a director should do when the director favored "an action being considered by the corporation"; (2) the WRH letter did not disclose that "the Huff parties had decided to pursue Eagle Ford opportunities through Riley–Huff and its other portfolio companies rather than Longview" and the letter was a "pretext designed to obscure the decision to hijack Longview's valuable Eagle Ford opportunity"; (3) "Riley–Huff ultimately acquired through Wyldfire thousands of acres first identified and targeted by Longview ... [and] neither Huff nor D'Angelo ever presented these opportunities to Longview or its Board"; and (4) HEF's actions "contravened Huff and D'Angelo's strict duty of loyalty to Longview, which prohibited them from exploiting business opportunities that fairly belonged to Longview."

We also note that Longview's "theme" of appropriating an opportunity was carried through to the remaining claims expressly asserted by Longview. Under the "Fraud" claim, Longview alleged (1) "D'Angelo and Huff concealed from Longview their intentions to appropriate the Eagle Ford opportunity for themselves and affirmatively misrepresented that Huff intended to fund an Eagle Ford investment through Longview"; (2) Longview did not know D'Angelo and Huff "would appropriate the very business opportunity they had encouraged and induced Longview to pursue"; (3) D'Angelo and Huff "went to great lengths to fraudulently conceal their ultimate design to appropriate the Eagle Ford opportunity for themselves"; (4) by "concealing and facilitating the scheme to appropriate the Eagle Ford opportunity, [the defendants] intended to cause Longview to: (a) use its own resources to develop the information necessary to make an investment in the Eagle Ford; and (b) refrain from pursuing alternative means for exploiting the Eagle Ford opportunity"; and (5) Longview "reasonably believed that: (a) D'Angelo and Huff did not intend to appropriate the Eagle Ford opportunity for themselves."

Under the "Tortious Interference with Prospective Business Relations" claim, Longview alleged the "defendants intentionally interfered with this prospective relationship [with the land brokers] by appropriating the Eagle Ford opportunity for themselves." Longview's petition also contained a paragraph entitled "Constructive Trust," which stated as follows:

> The defendants wrongfully usurped the Eagle Ford opportunity, and they were unjustly enriched by their wrongful conduct. Specifically, the defendants unjustly obtained thousands of acres of leases in the Eagle Ford that fairly belong to Longview. *Accordingly, Longview is entitled to a constructive trust over all the subject leases in the defendants' possession or on any assets that the defendants obtained by virtue of the usurpation.* [Emphasis added.]

Under a section entitled "Maximum Amount of Damages Claimed," Longview alleged "[t]he defendants stole Longview's opportunity to invest in the Eagle Ford by breaching their fiduciary duties, defrauding Longview, and misappropriating Longview's trade secrets."

If we cannot reasonably infer that the petition contains a claim, then we must conclude the petition does not contain this claim, even under our liberal construction. *See SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 354–55 (Tex.1995). Here, general allegations referring to an entity as a competitor of Longview did not implicate a cause of action based on competition. The facts alleged by Longview in conjunction with the wording of the claims expressly pled, leads us to the conclusion that the petition did not assert a separate competition claim that could reasonably be inferred from the specific language used in the petition.

When a plaintiff's petition omits an element of a cause of action or fails to state it with sufficient clarity to inform the defendant of the nature of the suit, a defendant must specially except to the plaintiff's pleadings. *Crabtree v. Ray Richey & Co.*, 682 S.W.2d 727, 728 (Tex.App.—Fort Worth 1985, no writ). On the other hand, when a plaintiff pleads none of the elements of a viable cause of action, the defendant is not obligated to file special exceptions that would suggest to the plaintiff possible causes of action against the defendant. Here, because we conclude a competition cause of action could not be reasonably inferred from what was specifically stated in Longview's petition, appellants were not required to file special exceptions that would suggest to Longview all possible causes of action that could be filed against them.

For these reasons, we conclude the trial court erred when it submitted question number two to the jury. Therefore, we next consider whether the error was harmful. We will reverse the trial court's judgment only if the charge error was harmful, meaning it probably caused the rendition of an improper verdict. *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 921 (Tex.2015); Tex. R. App. P. 44.1(a)(1). Submission of an improper jury question may be harmless when an appellate court determines the verdict was based on a valid theory of liability. *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E.Texas), L.P.*, 449 S.W.3d 474, 486 (Tex. 2014); *Thota v. Young*, 366 S.W.3d 678, 693–94 (Tex.2012).

In this case, Longview did not submit to the jury its claims for fraud, tortious interference with prospective business relationships, misappropriation of trade secrets, and conspiracy. Therefore, the only basis for liability against any of the appellants is that Huff and D'Angelo breached their fiduciary duty to Longview. Only jury questions one and two addressed whether Huff and D'Angelo breached their fiduciary duty, and all other findings flowed from the jury's affirmative finding on at least one of those questions. As explained above, we conclude the evidence is legally insufficient to support the jury's finding under question number one that Huff and D'Angelo failed to comply with their fiduciary duty to Longview "by taking a corporate opportunity," and the judgment cannot be affirmed on that basis. Therefore, the only remaining theory of liability for breach of fiduciary duty was the competition cause of action. Because we have concluded the verdict was based, in part, on the corporate opportunity theory of liability for which the evidence is legally insufficient, submission of the improper jury question on the remaining competition theory of liability was harmful because the jury found Huff and D'Angelo liable under

this theory. Therefore, the judgment cannot be affirmed on the grounds that Huff and D'Angelo failed to comply with their fiduciary duty of loyalty to Longview by engaging "in competition with [Longview] without the informed approval of [Longview's] board of directors."

## LIS PENDENS

■ Finally, appellants contend that if the judgment is reversed, this court should expunge any notices of *lis pendens* filed by Longview under Texas Property Code section 12.0071(c)(2). *See* TEX. PROP.CODE ANN. § 12.0071(c)(2) (West 2014). Section 12.0071(c) provides that a court shall order a notice of *lis pendens* expunged if that court determines "the claimant fails to establish by a preponderance of the evidence the probable validity of the real property claim." *Id.* § 12.0071(c)(2). Longview, however, claims this requested relief should be brought before the trial court. We agree.

It does not appear this court has jurisdiction to remove a notice of *lis pendens*. *See In re Estate of Sanchez*, No. 04–11–00332–CV, 2012 WL 1364979, *7 (Tex. App.—San Antonio Apr. 18, 2012, pet. denied) (mem.op.) (stating "Section 12.0071 allows a party to file a motion requesting *the trial court* expunge a notice [of] *lis pendens.*" (emphasis added)). Further, this court has not been provided any authority demonstrating this court's jurisdiction to remove a notice of *lis pendens*. Accordingly, we decline to issue any orders, as requested by appellants, to expunge the notices.

## CONCLUSION

For the reasons stated above, we conclude the evidence is legally insufficient to support the jury's finding on the corporate

opportunity question and we conclude Longview did not plead a competition cause of action. Therefore, we reverse the trial court's judgment and render a take-nothing judgment in favor of appellants.[6]

Concurring Opinion by: Marialyn Barnard, Justice

Dissenting opinion by: Luz Elena D. Chapa, Justice, joined by Rebeca C. Martinez, Justice

Concurring and Dissenting Opinion by: Patricia O. Alvarez, Justice.

Marialyn Barnard, Justice, concurring.

I join in the majority's judgment and agree with its analysis of appellants' complaints as to jury question two and the lis pendens issue. However, I differ with the majority's analytical approach with regard to the resolution of appellants' complaints relating to jury question one, and therefore concur in the judgment. I write separately only to set out the analysis I believe is mandated by the jury charge and applicable Delaware law.

### ANALYSIS

#### Delaware Substantive Law

In Delaware, the corporate opportunity doctrine arose as a means of defining the parameters of a corporate director's fiduciary duty of loyalty owed to her corporation in instances of potential conflict. *See Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del.1996). The seminal Delaware case on the corporate opportunity doctrine is *Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503 (1933). In *Guth*, the Delaware Supreme Court set out its view regarding the doctrine of corporate opportunity:

---

6. Because our disposition of the issues addressed in this opinion are dispositive of the appeal, we do not address appellants' remaining issues on appeal. TEX. R. APP. P. 47.1.

[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, *the law will not permit him to seize the opportunity for himself.*

*Id.* at 511 (emphasis added). Over time, the corporate opportunity doctrine, as delineated in *Guth* and its progeny, has evolved into the rule that a corporate director or officer cannot take a business opportunity for her own if:

(1) the corporation is financially able to exploit the opportunity;

(2) the opportunity is within the corporation's line of business;

(3) the corporation has an interest or expectancy in the opportunity; and

(4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to her duties to the corporation.

*Broz,* 673 A.2d at 154–55. The Delaware Supreme Court has also held *Guth* created a corollary rule that an officer or director *may* take a corporate opportunity for herself if:

(1) the opportunity is presented to the director or officer in his individual and not his corporate capacity;

(2) the opportunity is not essential to the corporation;

(3) the corporation holds no interest or expectancy in the opportunity; and

(4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity.

*Id.* at 155. Taken together, the tests enunciated in *Guth* define the contours of the corporate opportunity doctrine. *See id.* Under Delaware law, no one factor is dispositive and all factors must be taken into account, as applicable, to assist a reviewing factfinder in balancing the equities of an individual case.[1] *Id.* Ultimately, the factfinder is charged with "the determination of '[w]hether or not a director has appropriated for himself something that in fairness should belong to the corporation ....'" *Id.* (quoting *Johnston v. Greene,* 35 Del.Ch. 479, 121 A.2d 919, 923 (1956)).

With this in mind, I interpret the corporate opportunity doctrine, as set out by *Guth* and construed by its progeny, as directing the finder of fact to apply a two-step analysis in determining whether a director has breached her fiduciary duty of loyalty by usurping a corporate opportunity. Other courts have also interpreted *Guth* as setting forth a two-step approach, thereby creating "a more helpful approach ... for determining the ultimate question of when liability for a wrongful appropriation of a corporate opportunity should be imposed." *Miller v. Miller,* 301 Minn. 207, 222 N.W.2d 71, 81–82 (1974); *see PJ Acquisition Corp. v. Skoglund,* 453 N.W.2d 1, 8 (Minn.1990) (reiterating two-step approach from *Miller,* 222 N.W.2d at 81); *see also Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.,* 260 Ga. 584, 397 S.E.2d 699, 702 (1990) (noting Georgia Supreme Court adopted *Miller*'s two-step

---

1. In Delaware, the factfinder appears always to be a court of chancery, not a jury. *See Broz,* 673 A.2d at 155 ("the tests enunciated in *Guth* and subsequent cases provide guide-lines to be considered by a reviewing *court* in balancing the equities of an individual case." (emphasis added).

approach to liability). Although the test set out below differs in language from the approach set out in *Miller, see* 222 N.W.2d at 81, it does so, in my opinion, to better reflect the law of Delaware regarding the corporate opportunity doctrine, as set out in *Broz. Compare Broz,* 673 A.2d at 155 *with Miller,* 222 N.W.2d at 81.

The first step requires the factfinder to answer the threshold question of whether the business opportunity in question is actually a "corporate" opportunity. Under Delaware law, a *business* opportunity is a *corporate* opportunity if the factfinder determines it is by balancing the following factors: (1) whether the corporation is financially able to exploit the opportunity; (2) whether the opportunity is within the corporation's line of business; (3) whether the corporation has an interest or expectancy in the opportunity; and (4) whether by taking the opportunity for her own, the corporate fiduciary will thereby be placed in a position inimicable to her duties to the corporation. *See Broz,* 673 A.2d at 155. No one factor is dispositive. *Id.* In the event the factfinder determines the contested business opportunity *is* a corporate opportunity, the factfinder must then proceed to the second step of the analysis to determine whether it was nonetheless fair for the director to take the opportunity for herself.

In the second step, a factfinder may determine it is equitable for a director to take a corporate opportunity if: (1) the opportunity is presented to the director or officer in her individual and not her corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corpo-

ration holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity. *Id.* As with the first step, the factfinder is to balance the factors as "[n]o one factor is dispositive and all factors must be taken into account insofar as they are applicable." *Id.*

Based upon my review of Delaware law, I make two observations before proceeding with the analysis. First, and contrary to the position taken by appellants, I believe that whether a corporate opportunity exists is a question of fact to be determined by trier of fact. As set out above, to determine whether an opportunity is a corporate opportunity, the fact finder must balance four factors, keeping in mind that no one factor is dispositive. *See id.* Accordingly, the question is one of fact based on the evidence, not a legal question. Second, the jury in this case was not properly charged under Delaware law—specifically, and as explained below, the jury was presented with a single question with instructions, as opposed to the proper two-step approach required by Delaware law, and the jury was not instructed that the factors should be balanced and that no one factor is dispositive. *See id.*

### Proper Jury Charge

Given the interpretation of Delaware law set out above, a proper jury charge for the breach of fiduciary liability issue under Delaware's corporate opportunity doctrine would require two-steps, i.e., two jury questions that independently require the balancing of the equitable factors.[2] It

---

**2.** For exemplary purposes only, a proper jury charge under Delaware law on the issue of usurping a corporate opportunity might resemble the following:

   1. Was there a "corporate opportunity" rightfully belonging to the corporation?

   You are instructed that a director or officer of a corporation generally may not take a business opportunity for herself if it is determined the business opportunity is actually a "corporate opportunity" rightfully belonging to the corporation.

would be incumbent upon the trier of fact to first find the existence of a corporate opportunity before it could then move on and determine if the director breached her fiduciary duty to the corporation because she was not entitled to take the opportunity. I find the balancing of factors in each step—the *Guth* rule and *Guth* corollary—analogous to a Texas jury charge on the best interests of a child, i.e., the charge would instruct the jury to balance a list of factors, advising that no one factor is dispositive, to reach its ultimate determination.[3] *See, e.g.,* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES: TERMINATION OF PARENT-CHILD RELATIONSHIP, PJC 218.1A (2014) (recommending jury instruction that presents list of factors for jury to consider in determining best interest of child and instructing jury that no one factor is dispositive):

> In determining whether the disputed business opportunity is in fact a "corporate opportunity" belonging to the corporation, you may consider the following four factors:
> A. The corporation is financially able to exploit the opportunity.
> B. The opportunity is within the corporation's line of business.
> C. The corporation has an interest or expectancy in the opportunity.
> D. By taking the opportunity for her own, the corporate fiduciary will thereby be placed in a position adverse to her duties to the corporation.
> You are further instructed that you should balance the factors and that no single factor is dispositive.
> Answer "Yes" or "No."
> Answer: _____
> If you answered "Yes" to question 1, answer question 2.
> 2. Did any of those named below fail to comply with their fiduciary duty of loyalty to the corporation by wrongfully taking a corporate opportunity?
> You are instructed that a director or officer of a corporation may in fairness take a "corporate opportunity" for herself, in

However, the format of the jury charge in this case is notably different. Rather than a two-step approach comporting with our interpretation of Delaware law, the jury was presented with a single question with regard to usurpation of an opportunity. Jury question one asked:

> Did any of those named below fail to comply with his fiduciary duty to Longview Energy Company by taking a corporate opportunity?

Because they are Longview Energy Company directors, Bill Huff and Rick D'Angelo owe fiduciary duties to Longview Energy Company with respect to corporate opportunities.

A Longview Energy Company director may not take a corporate opportunity for himself if:

> (1) Longview Energy Company had an interest or a reasonable expectancy in the opportunity;

> the right circumstances. In determining whether a director or officer may fairly take a corporate opportunity for herself, you may consider the following four factors:
> A. The opportunity is presented to the director or officer in her individual and not his corporate capacity.
> B. The opportunity is not essential to the corporate.
> C. The corporation holds no interest or expectancy in the opportunity.
> D. the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity.
> You are further instructed that you should balance the factors and that no single factor is dispositive.
> Answer "Yes" or "No."
> Answer: _____

3. The list of factors used in the best interest instruction arises from Texas case law, specifically *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). This is akin to the factors in the proposed usurpation charge arising from Delaware case law, specifically *Guth,* as set out in *Broz. See Broz,* 673 A.2d at 154–55.

(2) Longview Energy Company was financially able to pursue the opportunity;

(3) the opportunity was within Longview Energy Company's line of business; *and*

(4) the director diverted the business opportunity to another and thus brought the director's interests into conflict or competition with Longview Energy Company's interest.

A Longview Energy Company director may take a corporate opportunity for himself if:

(1) the business opportunity is first presented to the director in his individual and not his corporate capacity;

(2) the opportunity is not essential to the corporation;

(3) the corporation does not have an interest or expectancy in the business opportunity; *and*

(4) the director has not wrongfully employed the resources of the corporation pursuing the opportunity.

Answer "yes" or "no" for each of those named below.

(a) Rick D'Angelo

Answer: _____

(b) Bill Huff

Answer: _____

(emphasis added) The jury answered "yes" in each answer blank.

I believe the format of the charge in this case is incorrect under a proper interpretation of Delaware law. Here, the charge presented the issue in a single question as opposed to the two-step approach required by Delaware law. Moreover, the charge does not account for the principle of Dela-

ware law that, when applying the *Guth* rules, "[n]o one factor is dispositive and all factors must be taken into account insofar as they are applicable" to balance the equities of the case. *Broz*, 673 A.2d at 155. Rather, the charge was given in the conjunctive, requiring the jury to find in the affirmative or negative as to each factor in the absence of further instruction. In other words, as a necessary consequence of the charge's basic conjunctive construction, an ultimate answer of "yes" necessarily meant the jury implicitly answered "yes" to each and every element of the "may not take" instruction, and "no" to at least one element of the "may take" instruction. Otherwise, the jury could not have answered "yes" to either question. Although there were objections to the jury charge, none of the objections raised the problems created by the charge's misapplication of Delaware law.[4] However, because the sufficiency of the evidence must be measured by the charge actually given to the jury, I proceed with my review based on the charge as given. *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005).

### *Legal Sufficiency of the Evidence*

In Texas, "[t]he sufficiency of the evidence must be measured by the jury charge when, as here, there has been no objection to it." *Romero*, 166 S.W.3d at 221. In other words, a court measures sufficiency based on the charge as given. *See id.* Texas law governs matters of procedure and remedy in Texas courts even when another jurisdiction's substantive law applies. *State of Cal. v. Copus*, 158 Tex. 196, 309 S.W.2d 227, 230 (1958);

---

**4.** Appellants objected to the jury charge with regard to the doctrine of corporate opportunity. However, the objections concerned only the content of the elements presented in the charge, rather than the proper format of applying those elements to determine liability, and the sufficiency of the evidence to support the submission. Longview did not object to this portion of the charge.

*see Moonlight Invs., Ltd. v. John,* 192 S.W.3d 890, 894 (Tex.App.—Eastland 2006, pet. denied). Texas standards of review are procedural and apply even when the substantive law of another jurisdiction is applicable. *McAfee, Inc. v. Agilysys, Inc.,* 316 S.W.3d 820, 824 (Tex.App.—Dallas 2010, no pet.); *Autonation Direct.com, Inc. v. Thomas A. Moorehead, Inc.,* 278 S.W.3d 470, 472 (Tex.App.—Houston [14th Dist.] 2009, no pet.); *Billman v. Mo. Pac. R.R. Co.,* 825 S.W.2d 525, 526 (Tex.App.—Fort Worth 1992, writ denied). Therefore, it must be determined whether the evidence is legally sufficient to support a rational juror answering "yes" to the existence of a corporate opportunity and each *Guth* rule determination because this was required by the charge actually given. Further, as a consequence of the jury charge given, there must be legally sufficient evidence for a rational juror to answer "no" to at least one element of the *Guth* corollary.

Jury question one asked the jury if Huff and D'Angelo breached their fiduciary duties by taking a corporate opportunity. The charge thereafter instructed jurors that Huff and D'Angelo could not take a corporate opportunity for themselves if: (1) Longview had an interest or a reasonable expectancy in the opportunity; (2) Longview was financially able to pursue the opportunity; (3) the opportunity was within Longview's line of business; and (4) Huff and D'Angelo diverted the business opportunity to another and thus brought their interests into conflict or competition with Longview's interests.

At oral argument, appellants contended jury question one "presumes" the existence of a "corporate opportunity." I respectfully disagree. As charged, I would hold the jury had to first find that a corporate opportunity existed before it could determine whether (1) Huff and D'Angelo

diverted an opportunity, (2) in which Longview had an interest or reasonable expectancy, (3) that was in Longview's line of business, and (4) that Longview was financially able to pursue. In other words, I believe jury question one—applying Delaware law—specifically required the jury to determine whether Huff and D'Angelo breached their fiduciary duties by taking a *corporate opportunity.* Thus, before the jury could find a corporate opportunity was taken, it had to find one existed.

Moreover, each instruction following question one required the jury to find that a corporate opportunity existed before deciding whether Longview had an interest in it, was financially able to pursue it, it was in Longview's line of business, or Huff and D'Angelo diverted it. Finally, and as discussed above, because of the conjunctive nature of the jury charge, it must not only be determined whether there is legally sufficient evidence of the existence of a corporate opportunity, but it must be determined whether there is legally sufficient evidence for each of the elements set out in the instructions for the jury's collective answer of "yes" to be supported. If there is legally insufficient evidence of the existence of an opportunity or any one of the elements relating to the usurpation issue, the jury's verdict cannot stand.

### Existence of a Corporate Opportunity

Under applicable Delaware law, "[g]enerally, the corporate opportunity doctrine is applied in circumstances where the director and the corporation compete against each other to buy something, whether it be a patent, license, or an entire business." *Thorpe by Castleman v. CERBCO, Inc.,* 676 A.2d 436, 443 (Del.1996). Although the boundaries of what may be considered a business opportunity are not firmly defined, the Delaware Supreme Court has referred to the opportunity as consisting of

"specific property." *Broz*, 673 A.2d at 156 (referring to actual or expectant interest in "specific property") (quoting *Johnston*, 121 A.2d at 924). The characterization of the contested business opportunity as "specific property" in *Broz* is consistent with the language from *Thorpe*, suggesting the boundaries of what should constitute a "business opportunity" within the meaning of the corporate opportunity doctrine. *Compare Broz*, 673 A.2d at 156 *with Thorpe*, 676 A.2d at 443. Therefore, based on Delaware case law, I would hold the scope of business opportunities for which a cause of action will lie under the corporate opportunity doctrine should be generally restrained to identifiably specific pieces of tangible or intangible property subject to acquisition, e.g., a patent, license, parcel of real estate, an entire business, stocks, etc. *See Thorpe*, 676 A.2d at 443; *Broz*, 673 A.2d at 156. I do not believe Longview has presented evidence of such a specific business opportunity.

On appeal, rather than direct this court to a specific contested piece of tangible or intangible property, Longview's brief describes the allegedly usurped "opportunity" as follows:

> [A] proprietary strategy for investing in the Eagle Ford ... to make an acreage play in the expanded oil window as [Mark] Lober redefined it, and Longview had identified the only source of acreage within that area.

At oral argument—both before the original panel and then before the en banc court—counsel for Longview defined the opportunity by its "three characteristics" as a *strategy*: (1) to acquire trend acreage in the Eagle Ford shale, (2) from Tamara Ford who had readily available acreage, (3) where Mark Lober recommended Longview should invest. Additionally, back in 2010, an internal memorandum from Longview CEO Bob Gershen to his fellow board members dated January 25, 2010, elaborated on this "strategy":

> On a hypothetical basis we have outlined a potential Eagle Ford program where we acquire 3,000 acres in each of seven prospects (21,000 acres in all). We then assumed we could find industry partners on a promoted basis for half of each well (on a third for a quarter basis) and drill the first well in each of the seven prospects. Exhibit B shows that based on average industry reported results, our project could be highly successful financially if it proves up the resource value of our acreage. The total capital costs for this hypothetical program (leasehold and drilling) are estimated to be $40 million and could generate results like those modeled by the end of next year.

Appellants Note and the Record Reflects, However, That This "Strategy" Is Unsupported By the Identification of Specific Leases, Acreage, Landowners, Prices, or Even Drilling Partners.

Having reviewed the record, the alleged business opportunity in question, as framed by Longview itself, is a compilation of information that Longview sought to use to further its business. Specifically, Longview had formed what it considered a proprietary strategy to invest in a large region of Texas using the following information: (1) Lober's research, and (2) land exclusively available from Ford. Rather than evidence of a business opportunity under the confines of Delaware's corporate opportunity doctrine, I would hold Longview's allegedly stolen "opportunity" is more akin to a trade secret. *See* DEL. CODE ANN. tit. 6, § 2001(4) (defining "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique or process, that: ... [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertain-

able by proper means by, other persons who can obtain economic value from its disclosure or use; and ... [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."); *see also In re Bass*, 113 S.W.3d 735, 739 (Tex.2003) (defining trade secret as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it."). Longview's pleadings support this conclusion because one of the three characteristics of its strategy/"opportunity," Lober's crucial role in identifying where to actually invest, was pled as a trade secret. Longview's petition asserted it:

> ...owned multiple trade secrets, including but not limited to: (a) Lober's analysis of seismic and geological data and wells logs; (b) commissioned maps; and (c) economic analyses and projections regarding the Eagle Ford opportunity.

Although the chance to license a trade secret from a third party may in itself be a business opportunity under Delaware law, *see Thorpe*, 676 A.2d at 443, it is not the right Longview sought to protect in this case, i.e., Longview never alleged appellants usurped its opportunity to license a trade secret from a third party.

Moreover, under Delaware's corporate opportunity doctrine, for a corporation "to have an actual or expectant interest in any *specific property*, there must be some tie between that *property* and the nature of the corporate business." *Broz*, 673 A.2d at 156 (quoting *Johnston*, 121 A.2d at 924) (emphasis added). In other words, a corporation has an actual or expectant interest in a business opportunity when there is a nexus, or tie, between the corporation's current business plan and the specific property sought to be acquired. *See, e.g., Broz*, 673 A.2d at 156 (holding that party

had no interest or expectancy in business opportunity to purchase cellular license when party "was actively engaged in the process of divesting its cellular license holdings." *Id.*); *Guth*, 5 A.2d at 514 (holding that Loft had interest or expectancy in business opportunity to purchase Pepsi-Cola because Loft had active desire to secure cola supply for distribution in its stores). Here, Longview has not directed the court to any specific property it sought to acquire from a third party from which a factfinder can make a nexus determination under *Broz. See Broz*, 673 A.2d at 156. Instead, Longview has only directed the court to evidence of what might amount to intellectual property it *already possessed,* i.e., a compilation of information turned into a strategic investment plan that may amount to a trade secret. I do not believe this evidence amounts to the existence of property comprising an opportunity that Longview may allege appellants wrongfully usurped.

Because I believe Longview has failed to present even a scintilla of evidence of a business opportunity as defined by Delaware law, I would also sustain appellants legal sufficiency challenge with regard to jury question one. *See Regal Fin. Co., Ltd. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex.2010). I contend reasonable and fair minded people could not find Longview had an interest or reasonable expectancy in an opportunity because Longview did not produce even a scintilla of evidence that a cognizable business opportunity existed. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

Based on the foregoing, I agree we must reverse the jury's finding that Huff and D'Angelo "fail[ed] to comply with [their] fiduciary duty [of loyalty] to Longview Energy Company by taking a corporate opportunity." However, it is my opinion that even if there was more than a scintilla of

evidence of the existence of cognizable business opportunity under Delaware law, there is legally insufficient evidence Longview had an interest or reasonable expectancy in it.

### Longview's Interest or Reasonable Expectancy in the "Opportunity"—Rejection

Even if there was more than a scintilla of evidence to support the existence of a corporate opportunity, the evidence establishes Longview had no interest or reasonable expectancy in any such opportunity. As stated above, "to have an actual or expectant interest in any specific property, there must be some tie between that property and the nature of the corporate business." *Broz*, 673 A.2d at 156 (quoting *Johnston*, 121 A.2d at 924). Appellants contend the evidence conclusively establishes Longview's board voted to reject the allegedly usurped opportunity to invest in the Eagle Ford shale. Therefore, under Delaware law, there can be no nexus between the alleged opportunity and Longview's business interests because Longview's rejection nullified any potential nexus. I agree.

Under Delaware law, a corporation can forfeit an interest or reasonable expectancy in a business opportunity by expressly disclaiming any interest in it. *See Kaplan v. Fenton*, 278 A.2d 834, 836 (Del.1971) (holding that corporation disclaimed interest in business opportunity by unanimously rejecting almost identical opportunity one month prior). In other words, a director is free to take a business opportunity for himself once his corporation has rejected any business interest in it. *See McGowan v. Ferro*, 859 A.2d 1012, 1039 (Del.Ch.2004), *aff'd*, 873 A.2d 1099 (Del. 2005); *Field v. Allyn*, 457 A.2d 1089, 1099 (Del.Ch.1983), *aff'd*, 467 A.2d 1274 (Del. 1983); *see also Broz*, 673 A.2d at 157 (cit-

ing *Field* for proposition and noting Delaware Supreme Court "affirmed the *Field* holding on the basis of the well-reasoned opinion of the court below.").

Further, "[w]hile presentation of a purported corporate opportunity to a board of directors, and the board's refusal thereof, creates a safe harbor for an interested director[,]" *Telxon Corp. v. Meyerson*, 802 A.2d 257, 263 (Del.2002), express presentation of an opportunity to the board is not required to avoid liability. *Broz*, 673 A.2d at 157. Rather, a director may analyze the situation himself to determine whether the opportunity is one rightfully belonging to the corporation; however, without presentation to the board, the director is subject to "the specter of a *post hoc* judicial determination that the director or officer has improperly usurped a corporate opportunity." *Id.*

Here, the record reflects Longview rejected investment in, and pursuit of, the very business opportunity it claims was usurped by appellants. The record shows Longview investigated the Eagle Ford shale prior to late January 2010, e.g., Longview hired Lober to do geology and geophysics analysis of the Eagle Ford shale, and it contacted land brokers Ford and Gooden with regard to available acreage. However, when given the chance to follow-up on that investigation with an actual investment, Longview decided to pass on the opportunity.

The apparent culmination of Longview's investigation into the Eagle Ford shale opportunity was the plan presented by Longview CEO Gershen to the board of directors on January 25, 2010. In a memo entitled "Path Forward—Recapitalization," Gershen set out a number of corporate growth opportunities including, as discussed above, a hypothetical program to invest $40 million in 21,000 acres of Eagle Ford land.

On January 27, 2010, Gooden emailed Longview executives Fuller and Pearce regarding acreage tracts available for lease in the Eagle Ford shale. Attached to this email is a "blob map" illustrating well over 100,000 acres of land available for lease. Gooden advised Fuller and Pearce that a decision would need to be made quickly because his map reflected "tracts that are open and available to lease today but not necessarily will be open tomorrow."

On January 28, 2010, Longview's board of directors met. The minutes reflect Pearce, on behalf of Longview's management, led a discussion of resource plays available for investment. Pearce identified the Eagle Ford shale play and the Bakken shale play in North Dakota as offering the most favorable economics for investment. However, no vote was taken with regard to these investment plans. Instead, Longview's management team was instructed to prepare economic models for four investment opportunities in advance of a February 1, 2010 board meeting. The potential investments included: (1) buying back 1.2 million shares of stock at $5 a share, (2) paying down corporate debt for 12 months at $500,000 per month, (3) investing $6 million in the Eagle Ford shale, and (4) investing $6 million in eight wells in California where Longview already had a presence. Each of the potential investments in Texas and California, as noted, were for $6 million.

On January 29, 2010, Fuller emailed Pearce, Gershen, and two others regarding a telephone discussion Fuller had with Gooden. Fuller reported that:

I just called Pat Gooden and told him that as a result of the Board meeting yesterday [January 28, 2010], Longview will not be able to provide capital for trend acreage in the Eagle Ford. He was disappointed but polite ... He asked if Longview would mind if he sub- mitted acreage to the other Huff portfolio company (and I can't recall their name right now) to see if possibly they might be interested. I told him I thought it would be a waste of his time given what we learned yesterday about Huff's lack of appetite for trend acreage, but wished him the best.

On February 1, 2010, Longview's board of directors gathered for a special meeting. At the meeting, a quorum of directors unanimously adopted a resolution charging the management to, among other things: "(a) promptly prepare for Board review and approval a five to eight well California drilling program to be funded by cash flow from operations ... and (c) aggressively continue discussions with potential merger candidates [for Longview]." Although this resolution was proposed by D'Angelo, it is noteworthy that it was unanimously adopted by the remaining six Longview board members who were not associated with appellants. The record does not reflect any other votes by Longview's board with regard to pursing an investment in the Eagle Ford shale.

As noted above, Delaware law allows a director to take a business opportunity for himself once his corporation has rejected it. See McGowan, 859 A.2d at 1039, aff'd, 873 A.2d 1099 (Del.2005); Field, 457 A.2d at 1099, aff'd, 467 A.2d 1274 (Del.1983). The foregoing sequence of events supports the conclusive finding that Longview rejected the very investment opportunity it alleges was usurped by Huff and D'Angelo, i.e., investment in thousands of available Eagle Ford acreage generally identified as blobs on a map. In fact, Longview rejected the opportunity twice. Initially, Longview passively rejected the opportunity by failing to approve Pearce's plan presented at the January 28, 2010 meeting. Then, three days later, on February 1, 2010, Longview's board definitively rejected in-

vesting in the Eagle Ford shale by unanimously voting to invest its available funds in California instead. According to the record, at least two board members, Pearce and Gershen, cast their vote in favor of California prospects knowing Gooden would offer the land to another Huff Energy Fund portfolio company. Moreover, Gershen, Longview's CEO and author of the investment plan set out in the January 25, 2010 memo, voted in favor of the California opportunity as opposed to investing in the Eagle Ford shale. Accordingly, because Longview rejected the alleged Eagle Ford shale opportunity, I would also hold directors D'Angelo and Huff could pursue that opportunity individually without breaching their fiduciary duties to Longview.

On appeal, the practical result of this conclusion is that there is legally insufficient evidence of Longview's interest or reasonable expectancy in the Eagle Ford shale opportunity as required by the jury charge. By rejecting the opportunity, Longview effectively disclaimed any tie between the alleged opportunity and the nature of its business, and is, in effect, estopped from claiming otherwise under Delaware corporate opportunity law. Stated alternatively, Longview, as an oil and gas company, voted it was no longer interested in the opportunity to invest in the developing Eagle Ford shale. Accordingly, I would also sustain appellants' legal sufficiency challenge because the evidence conclusively establishes the opposite of a vital fact, i.e., the evidence conclusively establishes Longview did not have an interest or reasonable expectancy in the purported business opportunity. *See Regal Fin. Co., Ltd.,* 355 S.W.3d at 603.

Longview raises two counter points to this conclusion regarding rejection: (1) corporate rejection requires an informed decision by the board of directors; and (2) Longview's rejection must be viewed in the context that it "actively pursued the Eagle Ford opportunity until Huff and D'Angelo unilaterally backed out of their false funding representations."

First, Longview argues "[r]ejection is a viable defense *only* if the defendant fully discloses all material facts to the corporation and the corporation's board gives informed approval for the [director] to exploit the opportunity on their own." I disagree. Longview is conflating its independent rejection of the alleged opportunity with the possibility of rejecting appellants' nonexistent attempt to invoke the safe-harbor rule.

In support of its argument, Longview cites to the following selected language from a footnote in *Thorpe*: "[d]isclosure to and informed approval by the board ..." *See Thorpe,* 676 A.2d at 442 n. 7. However, the full sentence in *Thorpe* reads "[d]isclosure to and informed approval by the board *may* insulate a director from liability where the corporate opportunity doctrine otherwise applies." *Id.* (emphasis added). The court in *Thorpe* then cited to *Broz* as the court set out Delaware's law on the safe-harbor exception. *Id.* Therefore, the authority Longview relies upon is clearly referring to "rejection" in the context of seeking safe-harbor protection, which would require a higher level of candor from D'Angelo than he exhibited, i.e., informing his fellow board members that Huff Energy Fund was not interested in Eagle Ford shale trend acreage when Riley–Huff Energy had just made that very investment days before. *See generally Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del.1989) (noting duty of candor "dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations," which would likely in-

clude voting on whether to reject pursuit of a presented business opportunity). Here, however, Longview independently rejected pursuit of the alleged opportunity, and there was no attempt by appellants to invoke safe-harbor protection. Unless a director is seeking safe harbor, Delaware law does not require a director to present an opportunity to the board for approval before taking it for himself. *See Broz*, 673 A.2d at 157.

However, even if Longview's claim about Delaware law and rejection was correct, it would not negate appellants' rejection claim. There is no question Longview's board was aware of the Eagle Ford shale opportunity that it claims was its proprietary plan; therefore, the equitable purpose of presenting the opportunity to the board for informed approval or rejection was satisfied nonetheless.

Second, in addition to its argument regarding informed rejection, Longview also attempts to soften its affirmative rejection of the alleged Eagle Ford shale opportunity by pointing out Huff "promised" to fund Longview's investment in the Eagle Ford shale but ultimately did not do so, requiring Longview to pass on the opportunity. Therefore, presumably, Longview cannot be held accountable for rejecting the opportunity because Longview relied on Huff's promised funding, without which it could not immediately invest in the Eagle Ford shale. However, Huff's alleged promise to fund any Longview investment "that Rick Pearce liked," is not in writing; rather, it is only supported by testimony in the record that "Bill Huff said that if we would locate an investment in the Eagle

Ford shale that Rick Pearce liked, that he would fund it." Longview's CEO Gershen admitted at trial there was no enforceable agreement requiring Huff to provide Longview with investment capital,[5] and although alleged by Longview, there is no substantive Delaware law placing a duty on either directors or shareholders of a corporation to contribute additional capital for a corporation's investment. Accordingly, because the alleged promise was unenforceable, I do not believe Longview's reliance entitles it to a different result with regard to our rejection analysis. To do so would, in essence, grant Longview relief it did not seek, i.e., recovery for breach of contract, and would also ignore the fact Longview still had six million dollars it could have invested in the Eagle Ford shale, instead choosing to spend the money in California.

### Longview—Financial Ability to Pursue the "Opportunity"

I further note that even if a corporate opportunity existed and Longview had not rejected it, Longview had to present some evidence it was financially able to pursue the alleged Eagle Ford shale opportunity. Longview was unsuccessful in this regard.

Delaware law allows reviewing courts "a number of options and standards for determining financial inability, including but not limited to, a balancing standard, temporary insolvency standard, or practical insolvency standard. *See Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 279, n. 2 (Del 1995). Admittedly, as a general matter, it appears a challenging fiduciary

---

5. Gershen was correct. Under Delaware law, Huff's alleged oral promise to invest millions of dollars runs afoul of the Delaware statute of frauds. *See* DEL. CODE ANN. tit. 6, § 2714 ("A contract, promise, undertaking or commitment to loan money or to grant or extend credit ... in an amount greater than $100,000 ... made by a person engaged in the business of lending money or arranging for the lending of money or the extending of credit shall be invalid unless it or some note or memorandum thereof is in writing." *Id.* § 2714(b)).

"faces a significant burden in establishing that a corporation was financially unable to take advantage of a corporate opportunity." *Norman v. Elkin*, 617 F.Supp.2d 303, 312 (D.Del.2009); *see, e.g., Broz*, 673 A.2d at 151–55 (finding inability where corporation had just emerged from contentious Chapter 11 bankruptcy with obligations owed to creditors limiting ability to commit capital to acquisition of new assets). Despite this burden, there is legally insufficient evidence to support the jury's implied finding that Longview had the financial ability to invest in the Eagle Ford shale opportunity, i.e., there is less than a scintilla of evidence of Longview's financial ability. *See Regal Fin. Co., Ltd.*, 355 S.W.3d at 603.

The evidence shows Longview needed approximately $40 million in capital. Appellants point out that Longview had $27 million in debt, secured by unspecified liens. They also note that Longview seemed to rely on Bill Huff's casual statement in September 2009 that "if Longview would locate an investment Pearce liked, he would fund it." In response, Longview points to evidence it claims establishes it could have raised the required money through stock sale recapitalization as suggested in January 25, 2010 "Path Forward—Recapitalization" memo sent to the board of directors. Longview also points to the testimony of Rick Pearce. When asked "[c]ould Longview have raised the money with enough time to fund this type of [investment]," COO Pearce, responded "Yes, we had in the past and we could again." The record reflects that from 2002–07, Longview raised $167.8 million in capital. Of that sum, $39 million was raised from Huff Energy Fund between 2006 and 2007. However, the evidence shows this money was raised over a significant period of time—five years—and the record is replete with evidence that with regard to the alleged opportunity in the Eagle Ford shale, time was of the essence. Pearce also testified Longview could have sold its California, Oklahoma, and Alaska assets and taken advantage of a $5.5 million line of bank credit. This too would have taken significant time, perhaps as much as three months.

As to any reliance by Longview on Huff's alleged promise that he would fund whatever Pearce "liked," this does not constitute evidence that Longview was financially able to take advantage of the alleged "opportunity." Longview suggests it had an agreement with Bill Huff whereby he would fund any investment Rick Pearce found for Longview. As discussed above, under Delaware law, Huff's alleged promise was not reduced to writing. Indeed, the existence of the "promise" is only supported by testimony from Pearce. However, Gershen correctly conceded, there was no enforceable agreement requiring Huff to provide Longview with any investment capital. *See* DEL. CODE ANN. tit. 6, § 2714(b). And, as previously noted, there is no substantive Delaware law placing a duty on either directors or shareholders of a corporation to contribute additional capital for a corporation's investment.

And Huff's alleged promise would not be enforceable under Texas law, if it were applicable. A contract is not enforceable if it is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992); *In re C.H.C.*, 396 S.W.3d 33, 48 (Tex.App.—Dallas 2013, no pet.). As the court stated in *T.O. Stanley Boot Co.*:

In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. The material terms of the contract must be agreed

upon before a court can enforce the contract. Where an essential term is open for future negotiation, there is no binding contract.

847 S.W.2d at 221. Here, taking Pearce at his word, there is nothing but a vague, indefinite promise to fund some unknown venture, at some unknown time, in some unknown amount. Thus, even under Texas law, Longview never had an enforceable promise from Huff upon which it could legally rely for purposes of funding an investment in the Eagle Ford shale.

As to Pearce's other statements regarding raising funds through stock sale recapitalization, as in the past, or by selling assets in other states, there is no evidence that these fundraising tactics could have been accomplished in a timely manner so as to allow Longview to undertake the alleged opportunity of buying thousands of acres in the Eagle Ford shale. As noted above, past fundraising efforts of the sort necessary to take advantage of acreage in the Eagle Ford shale took time. As Pearce testified, with regard to investing in the Eagle Ford shale, time was of the essence and Longview's "plan" assumed it would have $40 million to invest—money from Huff. Other than Pearce's alleged reliance on Huff—an unenforceable, indefinite promise—there is nothing in the record to show Longview had taken any affirmative steps to raise the necessary funds. In fact, according to Pearce, Longview "had never looked at an alternative plan of funding." Thus, according to Pearce, at the time the board rejected the hypothetical plan to invest, there really was "nothing to vote on."

Accordingly, based on the evidence regarding timing and Pearce's affirmative statements that Longview was relying on an alleged, unenforceable promise from Huff—having failed to even investigate alternate funding—I would hold there is no evidence that would have enabled reason-

able and fair minded people to conclude Longview was financially able to pursue the alleged opportunity. *See City of Keller*, 168 S.W.3d at 827.

### CONCLUSION

Thus, for the reasons set out above, I respectfully concur in the majority's judgment. Although I would resolve appellants' complaints relating to jury question one as set forth above, I ultimately agree with the majority's conclusion that the trial court's judgment must be reversed and a take nothing judgment rendered in favor of appellants.

Luz Elena D. Chapa, Justice, dissenting.

Longview Energy Corporation's live pleadings gave fair notice that a basic issue to be resolved at trial was whether Bill Huff and Rick D'Angelo engaged in competition with Longview by forming and operating Riley–Huff Energy Group without the informed approval of Longview's board of directors. In addressing the corporate opportunity issues, the majority and concurrence also misapply the applicable standard of review and re-define and narrow the scope of Delaware's corporate opportunity doctrine. Although the record clearly establishes the liability of Huff, D'Angelo, and Riley–Huff, I would hold the trial court abused its discretion by disregarding Riley–Huff s development costs and not limiting the constructive trust to the profits or benefits Riley–Huff obtained as a result of Huff and D'Angelo's breach of fiduciary duty. Because I would reverse and remand the case to the trial court for further proceedings regarding the proper remedy, I respectfully dissent.

### I

### FACTUAL BACKGROUND & PROCEDURAL HISTORY

Longview is an oil and gas company organized under the laws of Delaware and

headquartered in Dallas, Texas. In 2006, Huff Energy Fund (HEF), a firm that invests in several portfolio companies, invested in Longview and negotiated the right to seat two directors on Longview's board of directors. HEF selected Bill Huff and Rick D'Angelo, one of Huff's associates, to serve on Longview's board. By investing an additional $20 million in Longview, HEF became a 39–40% shareholder of the company.

In September 2009, members of Longview's executive management team met with Huff and D'Angelo to discuss opportunities for leasing acreage in an area known as the Eagle Ford. The Eagle Ford is an oil reserve in Texas that spans nearly thirteen million acres, where the market for leasing acreage to develop oil and gas assets at that time was becoming highly competitive. Huff and D'Angelo requested that Longview begin investigating Eagle Ford opportunities, and Huff told Longview that if it located an investment in the Eagle Ford that Longview liked, he would fund it.

Researching Eagle Ford opportunities and positioning itself to invest in the Eagle Ford for purposes of growth and financial prosperity became Longview's top priority over the next several months. Longview hired Mark Lober, a geologist and geophysicist, to analyze public data on the Eagle Ford and to discuss the "word on the street" with brokers. Lober analyzed seismic data, isopach (thickness) maps, well logs, geochemical information, pipeline infrastructure, existing wellbores, available acreage, and the activities of competitors in the area. Longview's management team also spent two-thirds to three-quarters of its time investigating Eagle Ford opportunities. Longview provided Lober's analyses to D'Angelo, who encouraged Longview to proceed with pursuing opportunities in the Eagle Ford.

Lober introduced Longview to Pat Gooden and Tamara Ford, brokers who were leasing acreage in the Eagle Ford. Gooden and Ford informed Longview that over 200,000 acres were available for leasing and provided Longview with "blob maps" showing areas for lease, the acreage available, general pricing information, and other information. Longview initially contemplated leasing approximately 40,000 acres in eleven counties for roughly $1,000 per acre.

Longview provided D'Angelo with the information it received and updates on its progress, and D'Angelo continued to express his enthusiasm about Longview's prospective investment opportunity. Longview made several attempts to contact Huff (who was the ultimate decision maker regarding HEF's financing of Longview's investment in the Eagle Ford), but was unable to meet with him because Huff was on vacation or otherwise unavailable.

Members of Longview's management team continued to meet with Ford, Gooden, and D'Angelo in December 2009 and January 2010. At a December 17, 2009 meeting, Lober presented his analyses, economic plans for how Longview could develop the acreage, and other information he received from Gooden and Ford. On December 21, 2009, Longview met again with Gooden and Ford, who relayed that Chesapeake, a major oil company, had purchased a significant amount of acreage that was under Longview's consideration. At that meeting, D'Angelo participated by phone and agreed that Longview was "absolutely ready" to go forward with an investment in the Eagle Ford. Longview sent D'Angelo the additional information it received from the brokers during the meeting. On January 13, 2010, Longview's management team discussed with D'Angelo a proposal to lease about 21,000

acres for approximately $40 million. Longview's strategy was to lease acreage, "prove up" the acreage, and then sell or assign the leases at a profit. The proposal was submitted to the directors as a way to increase the value of the shares for the benefit of Longview's shareholders.

Concerned about Huff's unavailability, Longview scheduled a board meeting for January 28, 2010, to consider the proposal. At the board meeting, D'Angelo informed Longview that Huff would not fund any investment in the Eagle Ford. Longview's board did not vote on the proposal at that meeting, but it considered other options for financing an Eagle Ford investment and investments in other areas. Because the price per acre in the Eagle Ford was soaring, Longview believed it had lost the opportunity to obtain a ground-floor acreage position in the Eagle Ford. Longview did not thereafter lease any Eagle Ford acreage.

Longview later discovered that in October 2009, Huff had formed Riley–Huff Energy Group, a Texas limited liability company with its headquarters in Oklahoma. Riley–Huff is also an oil and gas company that sought to acquire, develop, and sell assets in the Eagle Ford. Longview learned HEF was the limited partner and a 99% shareholder of Riley–Huff and D'Angelo had been serving as one of its managers since Riley–Huff s inception. Huff and D'Angelo never disclosed either of those facts to Longview, nor did they seek Longview's board's approval before forming and operating Riley–Huff.

Longview also discovered that after it notified D'Angelo about opportunities to lease acreage through Ford, Riley–Huff was in discussions with Ford about leasing Eagle Ford acreage. When Ford asked Riley–Huff about its relationship with Longview regarding leasing acreage in Eagle Ford, she was informed Riley–Huff s

relationship with Longview was "arms-length and competitive." Riley–Huff hired Jim Doherty to research and analyze some of the same types of information, specifically well logs and an isopach map, that Lober was researching and analyzing. After D'Angelo received the research and analyses from Doherty and Lober, HEF decided to fund only Riley–Huff s acreage play in the Eagle Ford.

Longview further discovered that three days before the January 28, 2010 board meeting, Riley–Huff signed a letter of intent with Ford to lease a significant amount of Eagle Ford acreage. Throughout 2010 and into 2011, Riley–Huff continued to lease additional acreage and develop its assets in the Eagle Ford. Riley–Huff determined its value had increased from about $32.3 million at the end of 2009 to more than $478 million by the end of 2010.

Longview filed suit against Huff, D'Angelo, HEF, WRH Energy Group LLC (HEF's general partner), Riley–Huff, and other defendants. The case proceeded to trial, and the jury found Huff and D'Angelo breached their fiduciary duties of loyalty to Longview by usurping a corporate opportunity and by competing with Longview without the informed approval of Longview's board of directors. The jury also found HEF and Riley–Huff liable for knowingly participating in Huff and D'Angelo's breach. The jury found that as a result of Huff and D'Angelo's breach, Riley–Huff acquired assets in the Eagle Ford. The jury answered four other questions about the market value, acquisition costs, past production revenues, and development costs related to Riley–Huff s Eagle Ford assets.

The trial court rendered judgment in Longview's favor. The trial court granted Longview an equitable interest in, and a constructive trust over, all right, title, and interest of Riley–Huff in and to specified

assets, including production revenues. The trial court also awarded Longview an additional $95.5 million. Huff, D'Angelo, HEF, WRH Energy, and Riley–Huff (Appellants) filed this appeal.

## II

### APPLICABLE LAW

The parties agree Delaware law applies to liability and remedy issues and Texas law governs procedural issues, which include issues of evidence, burdens of proof, pleadings, and standards of review. *See Robin v. Entergy Gulf States, Inc.,* 91 S.W.3d 883, 886 (Tex.App.—Beaumont 2002, pet. denied) (applying Louisiana substantive law and Texas procedural law, including the standard of appellate review); *see also Tex. Dep't of Corr. v. Herring,* 513 S.W.2d 6, 7–8 (Tex.1974) (describing rules regarding evidence, burden of proof, pleadings, and motions as procedural). I apply the law according to the parties' agreement. *See Helmerich & Payne Int'l Drilling Co. v. BOPCO, L.P.,* 357 S.W.3d 801, 805 (Tex.App.—Eastland 2011, no pet.); *Brown v. Pennzoil–Quaker State Co.,* 175 S.W.3d 431, 435 (Tex.App.—Houston [1st Dist.] 2005, pet. denied). When applying Delaware law, I first look for an authoritative decision from the Supreme Court of Delaware and if none is available, I give due deference to decisions by Delaware's lower courts and, if necessary, other authorities. *See Highland Crusader Offshore Partners, L.P. v. Andrews & Kurth, L.L.P.,* 248 S.W.3d 887, 890 n. 4 (Tex.App.—Dallas 2008, no pet.).

## III

### USURPATION OF A CORPORATE OPPORTUNITY

The majority's and concurrence's analyses of Appellants' corporate opportunity issues misapply both the standard of review under Texas law and substantive Delaware law regarding liability for usurping a corporate opportunity. The majority and concurrence do not measure the legal sufficiency of the evidence against the charge as given. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 530 (Tex.2002).[1] Appellants' only challenge to liability based on usurping a corporate opportunity is, expressly, "There Is Legally Insufficient Evidence *to Support the Jury's Answer to Question 1.*" (emphasis added). Although Appellants' briefs do not designate any issue or contain any argument as to the denial of their motion for directed verdict, the majority and concurrence measure the legal sufficiency of the evidence against a hypothetical jury charge under Delaware law, as demonstrated by the majority's and concurrence's references to and analyses of legal definitions and principles contained in Delaware case law. The jury was instructed that if a word was used in the charge in a way that was different from its ordinary meaning, the trial court would provide a correct legal definition. Because the charge did not define corporate opportunity, expectancy interest, or financial ability, the majority and concurrence err by measuring the legal sufficiency of the evidence against legal definitions not delineated or contained in the charge. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000); *Kroger Co. v. Brown,* 267

---

1. During the charge conference, Appellants objected to the submission of Question No. 1 based on its wording of (1) the specificity of the corporate opportunity; (2) expectancy or actual interest; and (3) rejection of the corporate opportunity. However, Appellants did not object to the absence of legal definitions or tender substantially correct legal definitions of the terms "specific corporate opportunity," "expectancy interest," or "financial ability." *See* TEX. R. CIV. P. 274, 278.

S.W.3d 320, 322–23 (Tex.App.—Houston [14th Dist.] 2008, no pet.).

Moreover, our standard of review requires that we view all the evidence in Longview's favor and also assume the jury made credibility determinations in Longview's favor, but the majority and concurrence both disregard evidence favorable to Longview. *See City of Keller v. Wilson,* 168 S.W.3d 802, 820, 823 (Tex.2005). The majority disregards significant evidence favorable to Longview in concluding there was no evidence that Huff and D'Angelo's purchase of Eagle Ford leases "hindered or defeated Longview's plan to also acquire acreage in the Eagle Ford." First, there was evidence that Huff did not fund Longview's resource play in the Eagle Ford because Huff funded Riley–Huff s resource play. Thus, Huff's leasing Eagle Ford acreage through Riley–Huff directly hindered Longview's potential and defeated its plans to lease Eagle Ford acreage. Second, as Appellants admit, many of the acres leased by Riley–Huff were in the areas being considered by Longview and were leased through brokers with whom Longview was also in negotiations. Third, there was evidence that by diminishing the supply of acreage in a high-demand market, Riley–Huff's purchase of Eagle Ford leases contributed to the soaring cost to lease Eagle Ford acreage that ultimately priced Longview out of a worthwhile investment in the Eagle Ford. The concurrence also makes credibility determinations and draws inferences unfavorable to Longview, when analyzing the jury's implied finding on financial ability and disregards evidence that Huff and D'Angelo's breach was the sole reason why Longview's board rejected the corporate opportunity.

The majority and concurrence also misapply Delaware law. The majority's reliance on *Johnston v. Greene,* 121 A.2d 919 (Del.1956), and *Colorado & Utah Coal Co. v. Harris,* 97 Colo. 309, 49 P.2d 429 (1935), is misplaced. This case does not present the situation contemplated by *Johnston* when the corporation is attempting to claim "any and every business opportunity" brought to the director in the director's individual capacity. *See Johnston,* 121 A.2d at 923–24. This case presents a much narrower scope of opportunities in which the corporation has an expectancy interest: only those opportunities a director induces the corporation to pursue. Also, *Colorado & Utah Coal Co.* is distinguishable in a key respect. There, the court addressed whether the evidence was sufficient to support a finding that there was *not* an expectancy interest in a corporate opportunity. *See Colo. & Utah Coal,* 49 P.2d at 430–31. Some evidence that could support a finding that there is no expectancy interest in a corporate opportunity does not necessarily conclusively establish the absence of an expectancy interest. The concurrence cites no Delaware case holding there was no corporate opportunity because the supposed business opportunity was not specific enough. Rather, under Delaware law, a corporate opportunity can include a group of varying business opportunities. *See, e.g., Dweck v. Nasser,* No. 1353–VCL, 2012 WL 161590, at *12 (Del.Ch. Jan. 18, 2012); *McGowan v. Ferro,* 859 A.2d 1012, 1026, 1039–40 (Del.Ch.2004). I, therefore, decline to adopt a hypothetical or theoretical approach in determining the corporate opportunity issues. Even if I were to agree with either or both opinions, I would nevertheless affirm liability based on the jury's answers to Question No. 2 regarding competition.

## IV

### COMPETITION

I respectfully disagree with the majority's conclusion that Longview did not give

fair notice of its competition claim. The majority mints a new "theme"-based standard of construing pleadings and holds that when a party pleads facts constituting two similar, yet distinct causes of action, but pleads more facts in support of one than the other, no fair notice is given of the less prominently pled cause of action. Although Appellants waived all complaints about defects and obscurities in Longview's pleading by not filing special exceptions, the majority recasts pleading defects and obscurities as reasons why Longview may not prevail on its competition claim. For the past 170 years, Texas has sought to eliminate such technicalities from its pleading standard. And, because the record confirms Appellants were informed and aware of Longview's intent to prove a breach of fiduciary duty of loyalty by competition, the trial court followed well-established Texas law and properly construed Longview's pleadings liberally in Longview's favor and so as to do substantial justice. By overruling Appellants' objection to the competition question in the jury charge, the trial court declined to reward Appellants for delaying until the charge conference to first complain about technical defects that, because of their failure to specially except, Longview had no opportunity or reason to correct. The majority's holding that a competition cause of action could not be reasonably inferred from Longview's live pleadings disregards our state's pleading standard.

## A. Appellants' Proposed Heightened Pleading Standard

Huff and D'Angelo's issue on appeal, which the other Appellants adopted and which the majority sustains, is that "Longview failed to plead a separate claim for competition." Appellants initially argued that Longview did not plead a competition claim because it failed to expressly plead the legal theory of "breach by competition"

separate from usurpation in the Claims section of its live pleading. In post-en banc submission briefing, Appellants add that even if Longview's entire live pleading is considered, the pleading is defective and ambiguous as to whether Longview was raising a competition claim. Although the majority adopts only the latter reasoning, an analysis of Appellants' initial argument helps to understand why both bases for Appellants' issue lack merit.

In arguing Longview did not plead the legal theory of "breach by competition" separate from "breach by usurpation" because competition was not clearly pled in the Claims section, Appellants incorrectly assume a party must expressly identify all of its legal theories of recovery in a particular part of its pleading. Alternatively understood, Appellants' argument is that when a party voluntarily pleads some legal theories of recovery, the party is not entitled to recover on any legal theory not expressly identified—even when, as is the case here, the petition affirmatively alleges facts supporting an additional legal theory and the opposing party does not specially except. Either way, Appellants have suggested that this court adopt a heightened pleading standard that is not supported by the plain language and purposes of the Texas Rules of Civil Procedure; contrary to Texas's more-than-a-century-old fair-notice pleading standard; and out of step with the notice-pleading standard other jurisdictions apply.

## 1. A party need not expressly plead legal theories of recovery to give fair notice.

The plain meaning of the Texas Rules of Civil Procedure neither expressly requires nor supports a requirement that parties expressly identify their legal theories of recovery in their pleadings. Under Rule 45, all pleadings in district court must

"consist of a statement in plain and concise language of the plaintiff's cause of action.... That an allegation be evidentiary or be of legal conclusion shall not be grounds for objection when fair notice to the opponent is given by the allegations *as a whole.*" TEX. R. CIV. P. 45(b) (emphasis added). Rule 47 provides, "An original pleading which sets forth a claim for relief ... shall contain ... a short statement of the cause of action sufficient to give fair notice of the claim involved." TEX. R. CIV. P. 47(a). Rules 45 and 47 use the undefined terms "claim" and "cause of action." A "claim" is "[a] demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for." BLACK'S LAW DICTIONARY 264 (8th ed.2004) ("claim"). Therefore, a pleading that sets forth a demand for money, property, or other legal remedy must contain a short statement of "the cause of action." *See* TEX. R. CIV. P. 45, 47.

A "cause of action" can be defined either as "[a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person," or "[a] legal theory of a lawsuit." BLACK'S LAW DICTIONARY 235 (8th ed.2004) ("cause of action"). As the Supreme Court of Texas has noted, "[T]he generally accepted meaning of ['cause of action'] refers to the 'fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief.'" *Loaisiga v. Cerda,* 379 S.W.3d 248, 255 (Tex.2012) (quoting *In re Jorden,* 249 S.W.3d 416, 421 (Tex.2008); *A.H. Belo Corp. v. Blanton,* 133 Tex. 391, 129 S.W.2d 619, 621 (1939)); *see* Charles E. Clark, *The Complaint in Code Pleading,* 35 YALE L.J.

259, 289 (1926) (explaining "cause of action" in pleading rules refers to the "facts giving ground for societal action through the courts"). Furthermore, Rule 45 provides that alleging legal conclusions is not objectionable when the allegations as a whole provide fair notice. TEX. R. CIV. P. 45(b). If Rules 45 and 47 are construed to require allegations of legal conclusions supporting "a legal theory of a lawsuit," then Rule 45's provision permitting the pleading of legal conclusions would be surplusage. *See In re Christus Spohn Hosp. Kleberg,* 222 S.W.3d 434, 437 (Tex.2007) (applying statutory rules of construction when construing rules of civil procedure); *Tex. Dep't of Pub. Safety v. Deakyne,* 371 S.W.3d 303, 307 (Tex.App.—San Antonio 2012, pet. denied) (citing *Spradlin v. Jim Walter Homes, Inc.,* 34 S.W.3d 578, 580 (Tex.2000), for proposition that courts should avoid constructions that make statutory language surplusage).

Under the plain meaning of Rules 45 and 47, a pleading states a "cause of action" if it alleges a factual situation that entitles the pleader to obtain a requested legal remedy. *See* TEX. R. CIV. P. 45, 47; *see also Loaisiga,* 379 S.W.3d at 255; BLACK'S LAW DICTIONARY at 234, 264.[2] Rules 45 and 47 do not require a party to expressly identify its legal theories of recovery, although such legal theories are not necessarily objectionable under Rule 45. TEX. R. CIV. P. 45, 47; *accord Ferguson v. Tanner Dev. Co.,* 541 S.W.2d 483, 492 (Tex.Civ.App.—Houston [1st Dist.] 1976) ("A plaintiff is not required to plead his legal theory for recovery if he pleads facts sufficient to support a recovery. It is the duty of the trial court to determine the law and apply it to the facts presented.") (citing *Behan v. Ghio,* 75 Tex. 87, 12 S.W. 996

2. Rule 50, which governs how allegations should be stated and how some of the required contents of a pleading should be organized, does not require a pleading to expressly identify any legal theories or make legal arguments. *See* TEX. R. CIV. P. 50.

(1889)), *rev'd on other grounds,* 561 S.W.2d 777 (Tex.1977).

The heightened pleading standard advocated by Appellants is also inconsistent with the purpose of Rules 45 and 47. The Supreme Court of Texas has explained Rules 45 and 47 require fair notice "such that the opposing party can prepare a defense." *In re Lipsky,* 460 S.W.3d 579, 590 (Tex.2015) (citing TEX. R. CIV. P. 45, 47). The ability to prepare a defense entails being informed of "the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 896 (Tex.2000). Courts applying Texas's fair-notice pleading standard must review the allegations as a whole (which necessarily includes all factual allegations) to determine whether a pleading gives fair notice. TEX. R. CIV. P. 45; *Paramount Pipe & Supply Co. v. Muhr,* 749 S.W.2d 491, 495 (Tex.1988); *Ware v. Crystal City Indep. Sch. Dist.,* 489 S.W.2d 190, 191 (Tex.Civ. App.—San Antonio 1972, writ dism'd) (per curiam). Ultimately, as the Supreme Court of Texas has explained, "[a] petition is sufficient if it gives fair and adequate notice of the *facts* upon which the pleader bases his claim." *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982) (emphasis added).

Texas has long rejected pleading rules, such as a requirement that legal theories of recovery be clearly and accurately identified, that prioritize form over substance. "In common-law pleading, 'issue pleading' was the norm.... It developed over the course of centuries into a highly technical exchange of written instruments ... having as their 'great object' the reduction of the dispute to a single issue." 2 ROY MC-DONALD & ELAINE E. GRAETON CARLSON, TEXAS CIVIL PRACTICE § 7:2, at 177 (2002 ed.). "[T]he common law system of pleadings was never used in Texas courts."

William V. Dorsaneo, III, *The History of Texas Civil Procedure,* 65 BAYLOR L. REV. 713, 717 (2013). Instead, Texas adopted "fact pleading," an equitable pleading system that required a statement of "the factual basis of the dispute rather than a technically precise selection of legal theories." 2 MCDONALD & CARLSON, § 7:2, at 178; *see* Dorsaneo, 65 BAYLOR L. REV. at 717; *see also Gunnells Sand Co. v. Wilhite,* 389 S.W.2d 596, 597–98 (Tex.Civ. App.—Waco 1965, writ ref'd n.r.e.) ("Texas early rejected the English system of pleading and adopted that of the Roman, or civil law, as modified by Spanish and Mexican practice."). Under Texas's former fact-pleading standard, the rules "required that pleading[s] state 'facts, in contradistinction to a statement of evidence, of legal conclusions, and of arguments.'" 2 MCDONALD & CARLSON, § 7:2, at 179 (quoting former Texas Rule of Civil Procedure 2).

Texas's fact-pleading standard stood in contrast to those of jurisdictions that followed the "theory of the pleadings" doctrine, which was a "'rule of pleading that a complaint must proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all.'" *See* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1219 (3d ed.2002) (quoting *Mescall v. Tully,* 91 Ind. 96, 99 (1883)). "In many ways the 'theory of the pleadings' doctrine seems to represent little more than a reversion to the pleading philosophy of the common law forms of action in a new guise and therefore [is] subject to many of the objections leveled at the common law system." *Id.* One such objection was that common-law pleading resulted in "dismissals based on technical deficiencies." *Id.* § 1374. The vast majority of jurisdictions in the United States have abolished the "theory of the pleadings" doctrine in favor of notice pleading or fact pleading, and do not re-

quire a party to expressly identify legal theories of recovery in the pleading stage.[3]

But even under Texas's former fact-pleading standard, the requirement that pleadings contain statements of facts and not legal conclusions or arguments became overly technical. "By 1925, it could be declared that 'into these simple rules ... has been injected by the courts a mass of technicalities that confound the oldest practitioner, .... A critical reexamination of the requirement of 'fact' pleading was an important aspect of the procedural reforms during the 1930s and 1940s." 2 MCDONALD & CARLSON, § 7:2, at 180 (quoting Thomas H. Franklin, *Simplicity in Procedure*, 4 TEX. L. REV. 83, 94 (1925)). In 1941, Texas Rules of Civil Procedure 45 and 47 were adopted, and Rule 45 provides, "That an allegation be ... of legal conclusion shall not be grounds for objection when fair notice to the opponent is given by the allegations as a whole." TEX. R. CIV. P. 45(b). "Rule 45 shifts the emphasis from the inherently unworkable metaphysical distinction [between facts and conclusions of law] to a thoroughly practical test of whether the pleading gives adequate notice.". 2 MCDONALD & CARLSON, § 7:4, at 189.

Like other jurisdictions' pleading rules, Rules 45 and 47 do not "countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, —— U.S. ——, 135 S.Ct. 346, 346, 190 L.Ed.2d 309 (2014) (per curiam); *see* TEX. R. CIV. P. 45, 47. Under the overall scheme of the Texas Rules of Civil Procedure, the identification and narrowing of the legal theories raised by the pleadings is a function of discovery and summary judgment. *See, e.g.*, TEX. R. CIV. P. 194.2(c) ("A party may request disclosure of ... the legal theories and, in general, the factual bases of the responding party's claims or defenses."); TEX. R. CIV. P. 197.1 ("An interrogatory may inquire whether a party makes a specific legal or factual contention and may ask the responding party to state the legal theories and to describe in general the factual bases for the party's claims or defenses."); *see also* 2 MCDONALD & CARLSON, § 7:2, at 180 (" '[T]he modem remedies of discovery ... and summary judgment ... are geared to the prompt disclosure of all facts and matters in dispute.' ") (quoting Charles E. Clark, *Simplified Pleading*, 27 IOWA L. REV. 272 (1942)). Thus, parties are not required to expressly plead legal

---

**3.** Federal Rule of Civil Procedure 8(a) requires a statement of the grounds of jurisdiction, a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for the relief sought. FED. R.CIV.P. 8(a). Similarly, Texas's rules require only a short statement of a cause of action, a statement of jurisdiction, a range of monetary relief, and a demand for all other relief to which the party may be entitled. TEX. R. CIV. P. 47. Federal Rule of Civil Procedure 8(a), and the states that have adopted rules nearly identical to Rule 8(a), do not require parties to expressly plead legal theories of recovery. *See Johnson v. City of Shelby, Miss.*, —— U.S. ——, 135 S.Ct. 346, 346, 190 L.Ed.2d 309 (2014) (per curiam); *see, e.g., Atlanta Newspapers, Inc. v. Shaw*, 123 Ga.App. 848, 182 S.E.2d 683, 685 (1971); *Shields v. Taylor*, 976

N.E.2d 1237, 1244 (Ind.Ct.App.2012); *Golden v. Den–Mat Corp.*, 47 Kan.App.2d 450, 276 P.3d 773, 784 (2012); *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243, 245 (1979); *State ex rel. B.M. v. Brian F.*, 288 Neb. 106, 846 N.W.2d 257, 267 (2014); *Illinois Controls, Inc. v. Langham*, 70 Ohio St.3d 512, 639 N.E.2d 771, 782 (1994); *Haley v. Town of Lincoln*, 611 A.2d 845, 848 (R.I.1992). Fact-pleading jurisdictions and notice-pleading jurisdictions that do not have rules modeled on Rule 8(a) also do not require a party to plead legal theories of recovery. *See, e.g., Roush v. Mahaska State Bank*, 605 N.W.2d 6, 9 (Iowa 2000); *Parish of Jefferson v. Bankers Ins. Co.*, 88 So.3d 1082, 1085 (La.Ct.App. 5 Cir.2012, writ denied); *Goodley v. Folino*, No. 2376 C.D.2010, 2011 WL 10858491, at *4 (Pa. Commw.Ct. July 22, 2011).

theories of recovery to give fair notice. And in determining whether a party received fair notice, we must consider the allegations as a whole and not simply scrutinize one particular section of a pleading.

### 2. Voluntarily pleading some legal theories does not alter the fair-notice pleading standard or necessarily waive legal theories not expressly pled.

The alternative understanding of Appellants' position is that when a party voluntarily identifies some legal theories of recovery in its pleading, the party may not recover on any legal theory not expressly pled—even when the pleading expressly alleges facts supporting an additional theory of recovery and the opposing party does not specially except. As a variant of a requirement that a party must plead legal theories, Appellants' position lacks support in the plain meaning and purposes of Rules 45 and 47 and, by virtue thereof, is not informed by the historical development of those rules. Appellants cite no well-reasoned authority supporting the proposition that by voluntarily identifying some legal theories of recovery in a pleading, a party alters the fair-notice pleading standard or imposes upon itself a heightened pleading standard. Such a proposition is precluded by the plain language of Rule 45, the liberal construction rule, and decisions of the Supreme Court of Texas.

The plain language of Rule 45 requires courts to consider the "allegations as a whole" when determining whether a pleading gives fair notice. TEX. R. CIV. P. 45(b). A requirement that trial courts consider only the legal theories identified in one section of a petition is directly contrary to Rule 45's plain language and defeats its purpose. See id. When a party includes some legal theories of recovery in a pleading and alleges facts supporting other legal theories, the omission of the other legal theories can create a misleading ambigui-

ty. City of Houston v. Howard, 786 S.W.2d 391, 393 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (citing 2 Mc-DONALD, TEXAS CIVIL PRACTICE, at 14–16 (1970)). Special exceptions must be filed to force clarification and specification in the pleadings when they are not clear or sufficiently specific. Hefley v. Sentry Ins. Co., 131 S.W.3d 63, 65 (Tex.App.—San Antonio 2003, pet. denied); see Stone v. Lawyers Title Ins. Corp., 554 S.W.2d 183, 187 (Tex.1977); Howard, 786 S.W.2d at 393.

If an opposing party chooses not to specially except and identify such an ambiguity or obscurity in a pleading, the pleader is given "no opportunity to correct it." Horizon/CMS, 34 S.W.3d at 897. Thus, "[w]hen a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader." Id.; see Howard, 786 S.W.2d at 393 (construing pleading, in absence of special exceptions, as raising legal theories not expressly pled but supported by alleged facts). In liberally construing the pleadings, "[a] court should uphold the petition as to a cause of action that may be reasonably inferred from what is specifically stated, even if an element of the cause of action is not specifically alleged." Boyles v. Kerr, 855 S.W.2d 593, 601 (Tex.1993).

Construing the express identification of some legal theories of recovery as an implied exclusion or disavowal of omitted legal theories is to apply the doctrine of expressio unius est exclusio alterius, an inherently restrictive rule of contract and statutory construction. See Americo Life, Inc. v. Myer, 440 S.W.3d 18, 24–25 (Tex. 2014); Mid–Century Ins. Co. of Tex. v. Kidd, 997 S.W.2d 265, 274 (Tex.1999). Because the Supreme Court of Texas has held that in the absence of special exceptions, a pleading must be liberally construed in favor of the pleader, courts should not deploy rules of statutory or

contract construction to narrowly construe a pleading and make "refined inferences against the pleader." · See De Loach v. Crowley's, Inc., 128 F.2d 378, 380 (5th Cir.1942) (interpreting the rule that pleading should be "construed so as to do substantial justice" in an identically phrased provision in Federal Rule of Civil Procedure 8(e)); Horizon/CMS, 34 S.W.3d at 897; 2 McDonald & Carlson, § 7:2, at 189–91.

The Supreme Court of Texas has held that in the absence of special exceptions, a party may prevail on a legal theory supported by the factual allegations in a pleading even if the legal theory was omitted from a list of other expressly pled legal theories. In Hammer v. Dallas Transit Co., the supreme court reversed the court of appeals that held:

> plaintiff did not sufficiently plead that defendant was negligent in being across the center of the road. Plaintiff generally described the nature of the accident and in doing so stated that defendant's bus crashed into plaintiff's car "when said bus crossed the center dividing strip on said street." In a subsequent paragraph of the pleading, plaintiff stated several specific acts and omissions of negligence without repeating that the bus was across the center of the road. Defendant urged no exceptions to the pleadings.

400 S.W.2d 885, 889 (Tex.1966). The supreme court disagreed, holding "We can not say that defendant was surprised or did not have fair notice of plaintiff's theory of the case." Id. And in Southwestern Bell Telephone Co. v. Garza, the supreme court held the plaintiff gave fair notice of a discrimination claim even though the plaintiff expressly pled his claim as one for retaliation. 164 S.W.3d 607, 616–17 (Tex. 2004). The court analyzed the issue as follows:

SWBT argues that Garza pleaded only unlawful discharge, not discrimination. . . . But Garza also pleaded that "[i]n retaliation for filing" a compensation claim, he was "ordered to find a non-driving position" and was thereby "effectively disqualified from his job." He sought damages for "retaliatory discharge under the Texas Workers' Compensation Act and wrongful conduct" of SWBT. While Garza's pleadings did not use the word 'discrimination,' they were nevertheless sufficient ·to ·raise that ·charge if they gave fair notice of the facts on which Garza based his action sufficient to allow SWBT to anticipate what evidence would be relevant and to prepare its defense. We think Garza's pleadings . clearly met this standard. Had SWBT been in doubt about Garza's claims, it could have sought clarification through special exceptions. It did not do so.

Id. Appellants' position, and the majority's suggestion, that Longview waived· a competition claim by not specifically listing competition as a separate breach of fiduciary duty in the Claims section of ·its pleading· is foreclosed by the supreme court's holdings in Hammer and Garza.

## B. Texas's Fair–Notice Pleading Standard & the Liberal Construction Rule

The majority misapplies Texas's fair-notice pleading standard and the liberal construction rule. It also recasts pleading defects and obscurities, to which Appellants chose not to specially except, as reasons why Appellants lacked fair notice. · As a result, the majority reaches an incorrect conclusion as to whether, with regard to competition, Longview pled a factual basis entitling it to relief under Delaware law, and thus gave fair notice of a competition claim. I decline to abandon Texas courts'

long-standing and well-established applications of these two rules.

***1. The majority incorrectly holds that pleading a cause of action fails to give fair notice if more facts are alleged in support of another cause of action.***

The majority reasons that because most of Longview's factual allegations are thematically related to usurpation of a corporate opportunity, the trial court erred by considering Longview's express allegations that Huff and D'Angelo formed and operated a direct competitor without Longview's knowledge or approval. The majority assumes without any authority that "competition" and "usurpation" are coterminous breaches of fiduciary duty or that if a plaintiff pleads more facts and legal arguments in support of one than the other, the plaintiff has not pled the other. But under Delaware law, a corporate director may be held liable for breaching his fiduciary duty if he usurps a corporate opportunity and/or engages in unapproved competition through a competing company. Pleading more facts in support of one of these two breaches does not per se preclude a party from pleading the other.

Under Delaware law, there are three elements of a corporate breach of fiduciary duty cause of action: (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) resulting injury or unjust enrichment. *See Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del.1939).[4] A director's acts of usurping a corporate opportunity and forming and operating a competing company are two distinct methods of breaching the fiduciary duty of loyalty. *See Sci Accessories Corp. v. Summagraphics Corp.,* 425 A.2d 957, 961, 964 (Del.1980) (analyzing whether employees' preparation to compete breached fiduciary duty although corporation had "abandoned its corporate opportunity thesis"); *Brown v. Fenimore,* No. 4097, 1977 WL 2566, at *5–6 (Del.Ch. Jan. 11, 1977) (holding corporate officer forming and operating competing towing company was a breach of fiduciary duty similar to a usurpation of a corporate opportunity); *Craig v. Graphic Arts Studio, Inc.,* 166 A.2d 444, 445–46 (Del.Ch.1960) (holding, without discussion of the corporate opportunity doctrine, that forming and operating a competing graphic design company was a breach of fiduciary duty); *see also Thorpe ex rel. Castleman v. CERBCO, Inc,* 676 A.2d 436, 442 (Del.1996) (noting "[t]he fundamental proposition that directors **may not** compete with the corporation") (emphasis added); 1 R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DEL. LAW OF CORPORA-

---

**4.** Huff and D'Angelo argue a "competitive injury" is necessary to show a breach. However, " 'the absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position.' " *In re Tri–Star Pictures, Inc., Litig.,* 634 A.2d 319, 334 (Del.1993) (quoting *Oberly v. Kirby,* 592 A.2d 445, 463 (Del.1991)), *disapproved of on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1038 (Del.2004); *cf. Brophy v. Cities Serv. Co.,* 31 Del.Ch. 241, 70 A.2d 5, 8 (1949) ("In equity, when the breach of a confidential relation by an employee is relied on and an accounting for any resulting profits is sought, loss to the corporation need not be charged in the complaint."). Huff and D'Angelo misplace their reliance on *Thorpe ex rel. Castle-*

*man v. CERBCO, Inc.* In *Thorpe,* the Supreme Court of Delaware explained "[t]he strict imposition of penalties under Delaware law are designed to discourage disloyalty." 676 A.2d at 445. " 'The rule ... **does not** rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy ... of ... extinguish[ing] all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.' " *Id.* (quoting *Guth,* 5 A.2d at 510) (emphasis added). The court in *Thorpe* then held the lower court erred by not disgorging benefits derived from a breach of fiduciary duty even though the lower court found the directors' breach "caused no injury to [the corporation]." *Id.* at 437, 445.

TIONS AND BUSINESS ORGANIZATIONS § 4.16 (3d ed.2015) (listing "competition with the corporation by officers or directors" and "usurpation of a corporate opportunity" as two of many ways a director can breach his fiduciary duty of loyalty to the corporation); RESTATEMENT (SECOND) OF RESTITUTION § 43m, cmt. d (2011) (recognizing "competing with the beneficiary" can breach one's fiduciary duty). The two breaches are distinct; they are not coterminous or mutually exclusive. *See Sci. Accessories Corp.,* 425 A.2d at 964; *Brown,* 1977 WL 2566, at *5–6; 1 BALOTTI & FINKELSTEIN, at § 4.16.

Although the majority suggests Appellants were not obligated to file special exceptions because Longview pled "none of the elements of a viable cause of action," Longview pled factual allegations and legal conclusions that, independently, raise all of the elements of a cause of action for competition. In the "Breach of Fiduciary Duty/Usurpation of a Corporate Opportunity" subsection under the Claims section, Longview pled in paragraph 55, "D'Angelo and Huff owe Longview a duty of loyalty." In paragraph 59, Longview alleged, "By diverting the Eagle Ford opportunity to themselves, D'Angelo and Huff placed themselves in a position of conflict or competition with Longview." In paragraph 62, Longview pled, "D'Angelo and Huff's breaches of duty and usurpation of Longview's opportunity proximately caused Longview injury and damages." In paragraph 54, Longview alleged Huff leased acreage through Riley–Huff rather than Longview because HEF would obtain 99% of the profits from Riley–Huff but only 39–40% of the profits through Longview. Longview also requested a constructive trust for Appellants' "breaches of fiduciary duty," and a constructive trust is a remedy for unjust enrichment under Delaware law. *See Guth,* 5 A.2d at 510.

Paragraph 62 alleged Longview was injured by "D'Angelo and Huff's *breaches* of duty *and* usurpation of corporate opportunity" (emphasis added). "Breaches" is the plural of "breach," and the plural denotes more than one. AMERICAN HERITAGE DICTIONARY (5th ed.2014) ("plural"). "And" means "in addition to" or "added to." *Id.* ("and"). The literal meaning of the allegation in paragraph 62 is that Huff and D'Angelo committed two or more breaches of fiduciary duty *in addition to* usurpation of a corporate opportunity. Paragraph 62 expresses Longview's intent to pursue multiple theories for breach of fiduciary duty other than usurpation of a corporate opportunity. Thus, Longview alleged (1) a fiduciary duty; (2) "breaches" of fiduciary duty in addition to usurpation; and (3) injury and unjust enrichment.

Appellants argue Longview's live pleading was unclear about whether one of the "breaches" it was alleging was by competition. If Appellants believed Longview's pleading was obscure, misleading, or ambiguous about its legal theories of recovery, they should have filed special exceptions. *See* TEX. R. CIV. P. 91; *Stone,* 554 S.W.2d at 187; *Hammer,* 400 S.W.2d at 889; *Howard,* 786 S.W.2d at 393. When a party does not file special exceptions to a pleading, the pleading must be construed in the pleader's favor and upheld "as to a cause of action that may be reasonably inferred from what is specifically stated, even if an element of the cause of action is not specifically alleged." *Boyles,* 855 S.W.2d at 601; *accord Horizon/CMS,* 34 S.W.3d at 897. Longview clearly alleged the first and third elements of a breach of fiduciary duty claim under Delaware law and ambiguously alleged the second element of breach. Appellants did not specially except. Therefore, Longview's pleading must be construed to uphold any cause of action that can be reasonably inferred from the rest of Longview's plead-

ing. *See Horizon/CMS*, 34 S.W.3d at 897; *Boyles*, 855 S.W.2d at 601.

To plead a cause of action, Texas's pleading rules require the allegations of a factual situation that entitled it to obtain relief. *See* TEX. R. CIV. P. 45, 47; *see also Loaisiga*, 379 S.W.3d at 255; *In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d at 437; *Deakyne*, 371 S.W.3d at 307. I would hold Longview satisfied this requirement. In paragraph 18, Longview alleged Huff and D'Angelo were directors of Longview. Under the subsection entitled "The Scheme and Its Roots," Longview pled:

> 29. Longview diligently educated its Directors concerning their duties of loyalty to the company. These duties demand absolute fidelity to Longview's interests and require an extra measure of diligence when a director may have divided interests by, for instance, simultaneously serving as a director, officer, partner, investor or manager of entities in competition with Longview . . . .
>
> . . . .
>
> 34. Not long after. Huff, D'Angelo and their associates directed Longview to pursue the Eagle Ford, Riley–Huff was formed (on October 28, 2009). Huff operatives Dartley, D'Angelo, and Bloom were listed as Riley–Huff's Managers. Bobby Riley was listed as its President as well as a Manager.

In paragraph 26, Longview alleged, "Riley–Huff is a direct competitor of Longview; on information and belief, one or more of the Huff Energy companies is directly or indirectly the majority and controlling investor of Riley–Huff." In paragraphs 23, 24, and 25, Longview repeated its allegations that Riley–Huff was one of Longview's "direct competitors." In paragraph 42, Longview alleged D'Angelo and another Huff associate were managers of Riley–Huff, "a fact neither of them disclosed to Longview." Paragraph 50 reads:

> On the eve of the January 28, 2010 Board meeting, [a Huff associate] sent a letter on behalf of WRH Energy to Longview expressing its displeasure with Longview's management, especially with regard to asset acquisitions. . . . The letter did not disclose that the Huff parties had decided to pursue Eagle Ford opportunities through Riley–Huff and its other portfolio companies rather than Longview, nor that it already had negotiated a contract with Ford's company, Wyldfire.

In Paragraph 53, Longview alleged "Riley–Huff ultimately acquired through Wyldfire thousands of acres first identified and targeted by Longview and it obtained tens of thousands of acres from other sources." Paragraph 54 alleges, "By as early as April 2010, Huff Energy had dumped almost $40 million into Riley–Huff s Eagle Ford play, which—by no coincidence—was exactly what Longview had proposed to do only weeks earlier to its Board (and to Huff and D'Angelo as Directors)."

Delaware law entitles a corporation to relief if one of its directors forms or operates a competing company without the corporation's consent. *See Brown*, 1977 WL 2566, at *5; *Craig*, 166 A.2d at 446. Longview alleged (1) Huff and D'Angelo were directors of Longview (Paragraph 18, 54); (2) Huff and D'Angelo formed a company that was a competitor of Longview (Paragraphs 23, 24, 25, 26, and 34); (3) Huff and D'Angelo operated Riley–Huff in competition with Longview (Paragraphs 53–54); and (4) Huff and D'Angelo did not disclose to Longview that they had formed and operated Riley–Huff (Paragraphs 42, 50). It is reasonable to infer that if Huff and D'Angelo did not disclose the formation and operation of Riley–Huff to Longview, Longview did not approve Huff and D'Angelo's formation and operation of Riley–

Huff *See Roark,* 633 S.W.2d at 809 (requiring courts to make reasonable inferences from pleader's factual allegations). Because Longview alleged a factual situation—Huff and D'Angelo's formation and operation of a competing company—that entitled it to obtain relief under Delaware law, Longview alleged a cause of action against Huff and D'Angelo for competition.

The petition gave fair notice of the competition claim. In the Factual Background of its pleading, Longview alleged facts supporting all essential elements of a competition claim against Huff and D'Angelo for competing with Longview through Riley–Huff. These allegations informed Huff and D'Angelo that their competition with Longview through Riley–Huff was an issue in the case and testimony regarding their competition through Riley–Huff would be relevant. *See Horizon/CMS,* 34 S.W.3d at 896. An attorney of reasonable competence could ascertain from the live pleadings that Huff and D'Angelo's secret formation and operation of a direct competitor was a basic issue in the case. *See Bowen v. Robinson,* 227 S.W.3d 86, 91 (Tex.App.—Houston [1st Dist.] 2006, pet. denied). As the factual allegations in *Hammer, Garza,* and *Howard* were sufficient to give fair notice of a claim that was not specifically alleged in the Claims section of the pleading, so too did Longview's pleading give Appellants fair notice of a competition claim. *See Hammer,* 400 S.W.2d at 889; *Garza,* 164 S.W.3d at 616–17; *Howard,* 786 S.W.2d at 393. In addition to those factual allegations, Longview further pled legal conclusions that Huff and D'Angelo's conduct constituted multiple "breaches" of fiduciary duty in addition to usurpation and placed themselves in "competition with Longview." Thus, Longview's allegations present a stronger case for fair notice than the allegations did in *Hammer, Garza,* and *Howard.*

The majority gives no weight to these allegations under its newly created "themes" standard of construing pleadings. The majority notes that despite Longview's allegations regarding competition and Huff and D'Angelo's "breaches" of fiduciary duty other than usurpation, the remainder of Longview's allegations thematically relate to usurpation—a different theory for a breach of fiduciary duty. There is no support in Texas law for construing pleadings in accordance with their themes—recurring, pervasive, dominant, or otherwise. Such a rule of construction adds unnecessary complexity where Texas courts historically have sought simplicity. *See Gunnells Sand Co.,* 389 S.W.2d at 597–98; 2 MCDONALD & CARLSON, § 7:2, at 177–80. The majority only demonstrates that Longview's usurpation allegations were more prevalent than Longview's competition allegations. But simply because a party alleges more facts and legal arguments in support of one cause of action than another, does not mean the other cause of action was not sufficiently pled. *See Hammer,* 400 S.W.2d at 889; *Howard,* 786 S.W.2d at 393. Thus, the majority misapplies Texas's fair-notice pleading standard and, as a result, I believe the majority errs in concluding Longview's pleading did not give fair notice of a competition claim.

***2. By recasting formal defects and obscurities in Longview's pleading as a "no fair notice" issue, the majority further misapplies the liberal construction rule and gives no effect to Texas Rules of Civil Procedure 90 and 91.***

By choosing not to specially except to Longview's live pleading, Appellants made no written objection to any defect or obscurity in Longview's live pleading in the trial court. *See* TEX. R. CIV. P. 90, 91. Rules 90 and 91 require a party who wishes to complain about a pleading's de-

fects or obscurities to identify the defect or obscurity in writing and to bring the special exception to the trial court's attention. TEX. R. CIV. P. 90, 91. Otherwise, all complaints about a pleading's defects and obscurities are waived. TEX. R. CIV. P. 90; *Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex.1992); *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 233 (Tex.App.—San Antonio 2001, pet. denied). When a party chooses not to specially except in accordance with Rules 90 and 91, then the opposing party is given no opportunity to correct the pleading defect or obscurity and, therefore, courts must liberally construe the pleading in the pleader's favor and uphold any claim or defense that is reasonably inferable from what is contained in the pleading. *Horizon/CMS*, 34 S.W.3d at 897.

In this context, the liberal construction rule is intended to assist courts in construing a party's pleading when the pleading contains defects and obscurities, formal and substantive, about which opposing parties have waived all complaints. *See id.*; *Roark*, 633 S.W.2d at 810. Unless a pleading is devoid of factual or legal allegations from which a claim or defense can be reasonably inferred, "no fair notice" arguments raised without a special exception in the post-pleading phases of litigation—such as the summary judgment phase or, as in this case, at the charge conference—should be resolved in the pleader's favor. *See Horizon/CMS*, 34 S.W.3d at 897; *Roark*, 633 S.W.2d at 809–10; *see also Med. Disc. Pharmacy, L.P. v. State*, No. 01–13–00963–CV, 2015 WL 4100483, at *12 (Tex.App.—Houston [1st Dist.] July 7, 2015, no pet.) (mem.op.) (applying fair-notice standard and liberal construction rule in determining whether pleadings supported submission of jury question); *U.S. Fire Ins. Co. v. Lynd Co.*, 399 S.W.3d 206, 221 (Tex.App.—San Antonio 2012, pet. denied) (applying the fair-notice standard and liberal construction rule in the summary judgment context). If formal pleading defects and obscurities—the complaints about which have been waived—could properly be recast as "no fair notice" arguments, then special exceptions would serve little to no purpose, the waiver rule provided in Rule 90 would have no effect, and the past 170 years' liberalization of Texas's pleading standard to prioritize substantive rights over compliance with technical rules would be largely undone. *See* 2 MCDONALD & CARLSON, § 7:2, at 177–80.

The majority recasts Longview's pleading defects and obscurities, about which Appellants have waived all complaints under Rule 90, as reasons why Longview did not give fair notice of a competition-based theory of liability. Although using other words, the majority faults Longview for obscurities created by the inclusion of obfuscatory legal allegations, and its failure to comply with Rules 45 and 47(a)'s requirement that the statement of its causes of action be "short" and "concise," and with Rule 50's requirement that each paragraph averring a claim be limited as far as practicable to a single set of circumstances.

The majority cites several pleading defects and obscurities as reasons why Appellants had no fair notice of a competition claim. First, the primary basis for the majority's holding is that the over-abundance of usurpation allegations obscured whether Longview intended to pursue a claim based on its competition allegations (an obscurity and arguable defect under Rules 45 and 47). Second, the majority notes Longview's pleading fails to include a separate paragraph in the Claims section in which Longview clearly states it is alleging competition as an independent cause of action (an arguable defect under Rule 50). Third, the majority notes Longview's re-

quest for a constructive trust was unclear because Longview had one request based solely on usurpation while it had a second, broader request for a constructive trust based on Huff and D'Angelo's "breaches" of fiduciary duty (an obscurity). Fourth, it notes that Longview characterized its other theories of recovery, such as fraud and tortious interference, "in terms of" usurpation (an obscurity). The majority claims it has liberally construed Longview's pleading in Longview's favor, but it has not done so in a way that effectuates the purpose of Rules 90 and 91, which require that a party file written special exceptions or waive any complaint about a pleading's defects and obscurities.

Appellants express a concern that if a party were to file an excessively long pleading and allege barely sufficient facts that comprise a claim or defense, an opponent would be deemed to have fair notice. However, a litigant has mechanisms available to address excessively long pleadings in which claims could be buried. First, a party can file special exceptions and force an opposing party to re-plead its causes of action shortly and concisely in separate paragraphs without extraneous, obfuscatory allegations. *See* TEX. R. CIV. P. 45, 47, 49, 50, 90, 91; *see also* 2 MCDONALD & CARLSON, §§ 9:25, 9:27.[6] Second, the party can serve interrogatories and requests for disclosures to have the opposing party identify their legal theories. *See* TEX. R. CIV. P. 194.2(c), 197.1. Third, the party can file a Chapter 10 motion for sanctions for attorney's fees when an opposing party files a pleading intended to delay or needlessly increase the cost of litigation. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 10.001(1), 10.002–.005 (West 2002). Given Texas courts' efforts to liberalize the

pleading standard, the greater concern is creating a technical, yet amorphous standard that—even in the absence of special exceptions—requires a party to plead claims and defenses in terms of prominent themes.

Ultimately, Appellants' failure to specially except in the trial court defeats the arguments they raise in their post-submission briefing. The purpose of special exceptions is to force clarification and specification when a pleading is defective or obscure. *See Hefley*, 131 S.W.3d at 65; *Stone*, 554 S.W.2d at 187; *Howard*, 786 S.W.2d at 393. Had Appellants filed special exceptions identifying the defects and obscurities upon which the majority bases its holding, Longview would have had the opportunity to correct and clarify its pleadings to address those alleged defects and obscurities. *See Horizon/CMS*, 34 S.W.3d at 897. By choosing not to file special exceptions, Appellants deprived Longview of the opportunity to correct and clarify its pleadings. *See id.* Longview should not be penalized on appeal because Appellants chose not to specially except in the trial court.

## C. The trial court properly construed Longview's pleading so as to do substantial justice.

Longview argues the record confirms Appellants were informed and aware that Longview was pursuing a theory of liability based on Huff and D'Angelo's competition through Riley–Huff. Trial courts must construe "[a]ll pleadings ... so as to do substantial justice." TEX. R. CIV. P. 45. When a pleading is ambiguous as to the legal theories upon which the pleader relies, courts must balance "the intent of the rules to eliminate technicality" and the

---

**6.** "If the trial court properly sustained the special exceptions and the plaintiff refuses or fails to amend, the trial court does not err in dismissing the cause of action." *Connolly v. Gasmire*, 257 S.W.3d 831, 838 (Tex.App.—Dallas 2008, no pet.).

need to ensure all "parties are ·aware of the basic controversies to be settled." *See* 2 McDonald & Carlson, § .7:4, at 191. Such determinations must be made on a case-by-case basis. *Id.* (citing *Murray v. O & A Express, Inc.*, 630 S.W.2d 633, 636 (Tex.1982)). Courts apply "a standard of convenience and fairness, bearing in mind the positions of the parties and such pertinent factors as their means of knowledge of the facts and access to necessary evidence." *Id.*; *see Hammer*, 400 S.W.2d at 889 (considering request for admission in determining whether a party had fair notice of theory of breach of duty in negligence suit).[7]

The record is replete with clear indications that confirm Appellants had fair notice of Longview's claim of a breach of fiduciary duty by competition. At the very least, the following shows why Appellants could not argue they were surprised by Longview requesting the submission of Question No. 2 at the jury charge conference.

- In their written response to Longview's motions in limine, Appellants noted, "The crux of Plaintiff's claim is a lack of disclosure on the part of the Huff Defendants with regard to the Huff Defendants' alleged competition with Longview.... The Confidentiality Agreement referenced in Plaintiffs Motion in Limine ... provides disclosure to Longview that the Huff Defendants were in competition with Longview. This evidence is directly relevant to the Huff Defendants' defense in this litigation, and directly contradicts Plaintiffs primary theory in this case."

- Huff and D'Angelo also filed a motion to exclude Longview's expert Ronald J. Gilson. The motion, which was based not upon relevance but upon

**7.** *See, e.g., Fountains Int'l Group, Inc. v. Summit Oak Dev., LLC*, No. 04–14–00205–CV, 2015 WL 1138418, at *3 n. 2 (Tex.App.—San Antonio Mar. 11, 2015, no pet.) (mem.op.) (noting that language in the partial summary judgment was "an indication that Summit Oaks was well aware that Fountains International was seeking to recover interest accruing after September 14, 2002"); *U.S. Fire*, 399 S.W.3d at 221 ("Further, the record indicates that U.S. Fire was aware that one of the issues to be resolved at the bench trial was the amount of penalty interest owed on the $5 million in payments made by U.S. Fire. We conclude U.S. Fire had fair notice of Lynd's claim for statutory interest on the $5 million payment."); *Jefferson Cnty. Appraisal Dist. v. Morgan*, No. 09–11–00517–CV, 2012 WL 403861, at *2 (Tex.App.—Beaumont Feb. 9, 2012, no pet.) (mem.op.) (holding that although petition did not refer to 2006 tax year appraisal, record supported conclusion that petition's reference to 2005 tax year was mistake and "[t]here could be no confusion by the parties on that point"); *Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 68 (Tex.App.—Texarkana 2004, pet. denied) (noting "the depositions of Russell and Lori Burke indicate that UPRC was well aware that the Burkes were seeking damages for the dead cattle and the decreased weight gain of the surviving cattle"); *Boorhem–Fields, Inc. v. Burlington N.R. Co.*, 884 S.W.2d 530, 534 (Tex.App.—Texarkana 1994, no writ) ("The record as a whole indicates that Boorhem–Fields had fair notice that the entire clearances provision was in dispute."); *Cartwright v. MBank Corpus Christi, N.A.*, 865 S.W.2d 546, 552 (Tex. App.—Corpus Christi 1993, writ denied) ("Construing the pleading with an effect to do 'substantial justice' and mindful that the Cartwrights were not prejudiced in their attempt to raise defenses against the note, we hold the pleadings sufficient to allow judgment ...."); *see also Lone Star Gas Co. v. Thomas*, 345 S.W.2d 844, 848 (Tex.Civ.App.—Fort Worth 1961, writ ref'd n.r.e.) ("The modern tendency is toward greater liberality in the construction of pleadings in order not to require the retrial of a case when justice has been done, and the parties understood what the points in issue were, and the same were submitted to a court or jury."); 2 McDonald & Carlson, § 7:4, at 190 ("Notice is obtained not merely from the pleadings. The availability of discovery procedures relieves the pleader of the burden of alleging the details of a claim ... as may be sought in preparation for trial.").

improper expert testimony, sought to exclude Gilson's opinions that under Delaware law "competition is prohibited" and Huff and D'Angelo were prohibited from "competing with Longview without disclosure." Huff and D'Angelo objected to Gilson's "testi[mony] that Huff and D'Angelo somehow competed with Longview in violation of an economic fiduciary "obligation" consistent with Delaware law." Huff and D'Angelo also objected to Gilson's "opin[ion] that Huff and D'Angelo 'prevented Longview from competing with economic interests of Huff entities.' "

- Huff and D'Angelo attached Gilson's deposition testimony as Exhibit A to their motion to exclude. Gilson's deposition testimony includes significant discussion of Huffs competition with Longview through Riley–Huff.

- Attached as Exhibit B to Huff and D'Angelo's motion to exclude was Longview's response to a request for disclosures in which Longview disclosed "the legal theories and … factual bases" for its claims. Longview explained Riley–Huff was "a competing company that the defendants formed shortly after Longview began investigating the Eagle Ford" and that D'Angelo served as a manager without disclosure to Longview. Longview further disclosed that "Huff and D'Angelo owed fiduciary duties to Longview by virtue of their position on the Longview board of directors. They breached these duties when they stole Longview's proprietary information, diverted the Eagle Ford opportunity to a competing entity from which they stood to gain a larger profit, and failed to present to Longview other opportunities to invest in the Eagle Ford." Longview listed D'Angelo and several others as persons with knowledge of

relevant facts and stated they were "involved with several oil and gas companies that are direct competitors of Longview, including … Riley–Huff." The disclosures also mentioned Gilson's opinions, including the following: "The duties of directors are well known: … Reasonably prudent directors know that they must conform their behavior to a standard of conduct mandating that their first loyalties are to the corporation (not to their own self-interest or that of another organization) and to which they must be candid, make full disclosure, and avoid competing interests"; "During the critical investment period (late 2009/early 2010), neither Huff nor D'Angelo disclosed to Longview's board that Huff Energy was investing heavily in the Eagle Ford trend or that Longview was in competition with Riley–Huff for Eagle Ford acreage, including acreage available through Wyldfire"; and "Huff and D'Angelo acted in competition with Longview while they were in possession of information that Longview had provided to them." The disclosures also mentioned the following expert opinion of Robert Valdez: "Anyone who is a director of a corporation knows that he or she must be strictly faithful and loyal to the company. This means that a director who has a conflict of interest or who wants to compete with the company must first get the permission of the majority of other directors."

- Longview filed a motion to exclude the testimony of Gilbert Herrera, an expert witness for Appellants. Longview noted Herrera was hired to compare the "due diligence of competing oil and gas companies—Longview Energy and Riley–Huff." Longview ar-

gued Herrera's opinion as to the reasonableness of Huffs evaluation of Longview's due diligence was irrelevant because "Huff and D'Angelo, as board members, *owed a fiduciary duty not to compete with Longview,*" (emphasis in original) and cited authority supporting that Delaware law recognizes competition as a breach of duty separate from usurpation of a corporate opportunity.

- Attached to Longview's motion to exclude was a defendant's response to a request for disclosure stating, "Herrera will ... testify regarding the industry practice and/or custom that is associated with private equity investors having more than one portfolio company competing for the same and/or similar investment, including investments in competing oil and gas companies.... Herrera shall opine that it is common ... for investors, like the Huff Defendants, to make and/or consider investments in companies that may compete in the same industry and/or area."

- In Longview's response to Riley-Huff's motion to expunge *lis pendens,* Longview's Preliminary Statement begins with the assertion that "Defendants stole oil and gas leases properly belonging to Longview and lodged them in Riley-Huff, an entity established and maintained for the express purpose of illegally competing with Longview."

The record confirms Huff and D'Angelo were informed and aware that their unapproved competition with Longview through Riley-Huff was a basic issue to be settled at trial, and testimony regarding this issue would be relevant. *See Horizon/CMS,* 34 S.W.3d at 896. Thus, the trial court properly construed Longview's pleading "so as to do substantial justice." Tex. R. Civ. P.

45; *accord Howell v. Mauzy,* 899 S.W.2d 690, 707 (Tex.App.—Austin 1994, writ denied) ("Technical rules of pleading cannot defeat a right substantially alleged.") (citing *Barnes v. Patrick,* 105 Tex. 146, 146 S.W. 154, 155 (1912)); *see also De Loach,* 128 F.2d at 380; 2 McDonald & Carlson, § 7:4, at 189, 191.

### D. Conclusion

Longview's pleading contained factual allegations that Huff and D'Angelo, while active directors on Longview's board, formed and operated a competing company, Riley-Huff, without disclosing this competition to Longview or seeking its prior approval. Under Delaware law, this is a breach of fiduciary duty separate from usurping a corporate opportunity. In the absence of special exceptions, Longview's live pleading was sufficient to give Appellants fair notice that Huff and D'Angelo's competition with Longview through Riley-Huff was one of the "breaches" of fiduciary duty to be resolved at trial. Applying nearly 170 years of Texas jurisprudence in considering Longview's allegations, and liberally construing them in Longview's favor, I would hold Longview gave fair notice of a competition claim. The trial court's overruling of Appellants' objection to the submission of Question No. 2 is further supported by clear evidence in the record confirming that Appellants were given fair notice—through pleadings, interrogatories, disclosures, motions in limine, and expert deposition testimony, including Appellants' own defense expert's hired to rebut Longview's competition allegations—that Longview intended to prove a breach of fiduciary duty based on Huff and D'Angelo's direct competition with Longview by forming and operating Riley-Huff. Question No. 2 regarding competition was supported by the pleadings; and thus the trial

court did not err by submitting the question to the jury.[8]

# V

## CONSTRUCTIVE TRUST & MONETARY AWARD

Appellants raise numerous other issues, arguing that Longview is not entitled to either a constructive trust or monetary relief and, alternatively, Longview may not recover both. As explained below, I would sustain Appellants' issues regarding the trial court's error in not accounting for Riley–Huff's developments costs, and reverse and remand for further proceedings. I would overrule Riley–Huff's remaining issues.

### A. *Explanation of the Jury Findings & Trial Court's Judgment*

After finding Huff and D'Angelo breached their fiduciary duty to Longview, and that Riley–Huff was liable for knowingly participating in their breach, the jury found Riley–Huff acquired assets in the Eagle Ford shale "as a result of" the breach. The jury also answered four valuation questions regarding Riley–Huff s Eagle Ford assets:

> The market value of the assets in the Eagle Ford shale that Riley–Huff acquired as a result of Huff and D'Angelo's breach was **$42 million.**
>
> The amount Riley–Huff paid for its assets in the Eagle Ford shale was **$24.5 million.**
>
> The amount of past production revenues Riley–Huff derived from the wrongfully acquired assets in the Eagle Ford shale was **$120 million.**

Riley–Huff paid **$127 million** to develop the assets it acquired in the Eagle Ford shale.

Longview acknowledged during oral argument that it may recover either (1) the assets in a constructive trust or (2) the assets' market value of $42 million. Longview requested that the trial court impose a constructive trust on the Eagle Ford assets Riley–Huff acquired as a result of Huff and D'Angelo's breach of fiduciary duty. Riley–Huff requested an offset against the constructive trust for its acquisition and development costs, but Longview argued Riley–Huff was akin to a bad-faith trespasser and thus not entitled to offsets for development costs.

Granting Longview's request, the trial court awarded Longview a constructive trust on the Eagle Ford assets rather than the assets' market value of $42 million. The trial court also awarded Longview $120 million for the value of the past production revenues. Although the trial court offset the $120 million by the $24.5 million in acquisition costs, it did not offset Riley–Huff s development costs of $127 million. As a result, the judgment awards Longview a constructive trust (without offsets) and an additional $95.5 million.

The trial court granted Longview an equitable interest in and imposed a constructive trust "over all right, title and interest of Riley–Huff in and to" the Eagle Ford assets identified by the judgment. It ordered Riley–Huff "to execute and deliver to Longview all instruments and documents and to do all acts and things as may be necessary to fully transfer, convey, grant, or assign to Longview the legal title

---

8. I would further hold Riley–Huff s liability for aiding and abetting was established through the jury's findings, which were supported by sufficient evidence that Riley–Huff knowingly participated in Huff and D'Angelo's breach. Under Delaware law, Riley–Huff can be held liable for aiding and abetting a breach of fiduciary duty. *See Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001); *O'Malley v. Boris,* 742 A.2d 845, 851 (Del. 1999).

to all of the respective properties, rights and interests." The trial court specified the leases by reference to two of Appellants' trial exhibits, Exhibits 2166 and 2860. Exhibit 2166 contained all of the actual Eagle Ford leases at issue in the case, and Exhibit 2860 was a list of those leases.

The trial court incorporated Exhibit 2860 as two exhibits to the judgment: Exhibit A contains all leases Riley–Huff executed between January 2010 and February 2011, and Exhibit B are those leases "expressly excluded from the Constructive Trust" that Riley–Huff acquired "pursuant to the 'BGE' transaction and the 'Maali' transaction" and executed before January 2010. Also included in the constructive trust are ancillary interests related to the included leases; wells located on the leased acreage; all oil, gas, and other minerals produced therefrom; all production revenues derived therefrom, from June 2, 2012 (the date of the jury's verdict) until the date of transfer of the assets; and all documents and records related to the leases.

## B. Standard of Review & Applicable Law

Under Texas law, the imposition, scope, and application of a constructive trust is generally left to the trial court's discretion. *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex.App.—San Antonio 2007, pet. denied). A trial court abuses its discretion if it acts arbitrarily, unreasonably, without reference to any guiding rules and principles, or without supporting evidence. *Id.* Because the parties agreed in the trial court that Delaware law applies

to remedy issues, Delaware law provides the applicable guiding rules and principles.

Under Delaware law, the "imposition of a constructive trust upon all profits derived from the competing [company]" is a proper remedy for a breach of fiduciary duty by competition. *Brown*, 1977 WL 2566, at *5; *see Guth*, 5 A.2d at 510. A constructive trust "is an equitable remedy of great flexibility and generality." *Hogg v. Walker*, 622 A.2d 648, 652 (Del.1993). Under Delaware law, the purpose of a constructive trust in the corporate context is to ensure a corporate director does not profit from breaching his fiduciary duty of loyalty. *Guth*, 5 A.2d at 510. "[T]he duty to transfer the property relates back to the date of the wrongful act that created the constructive trust." *Hogg*, 622 A.2d at 652.

## C. The $95.5 Million Award

Appellants argue the trial court erred by denying Riley–Huff's request for offsets against the constructive trust and not awarding reimbursement for Riley–Huff s development costs of $127 million.[9] Longview's basis for the $95.5 million award in addition to the constructive trust is that Riley–Huff was akin to a bad-faith trespasser and did not prove its development costs were reasonable and necessary. Thus, the propriety of the $95.5 million award turns on whether, under Delaware law, Riley–Huff is entitled to offsets against the constructive trust for its development costs.

Delaware law limits constructive trusts to disgorging unjust enrichment (profits or benefits). *See Guth*, 5 A.2d at 510. Recognizing this principle, Delaware courts award offsets when imposing a con-

9. In the same issue, Appellants also argue that the constructive trust's inclusion of post-verdict production revenues should have been limited to profits. In accordance with this

section's conclusion, I would also hold the trial court abused its discretion by not limiting the constructive trust to post-verdict profits.

structive trust without regard to bad faith or whether the expenses were "reasonable and necessary." *See Walker v. Res. Dev. Co. Ltd., L.L.C. (DE),* 791 A.2d 799, 818 (Del.Ch.2000); *see, e.g., Hayward v. Green,* 88 A.2d 806, 812 (Del.1952). Longview cites no authority, and I found none, that under Delaware law, a constructive trust may include more than profits or benefits when a corporate director breaches his fiduciary duty in bad faith. I would hold the trial court erred by awarding Longview $95.5 million in addition to the constructive trust because it did not account for Riley–Huff's development costs of $127 million. *See Guth,* 5 A.2d at 510.

### D. Constructive Trust

Appellants argue the judgment is defective because the constructive trust language is "void for vagueness" and violates the statute of frauds; the constructive trust violates the rights of third parties; Longview did not trace the leases in the constructive trust to usurping a corporate opportunity; and the constructive trust gives Longview an inequitable windfall.

I would overrule Appellants' vagueness, statute-of-frauds, and "rights of third parties" issues. The judgment clearly orders Riley–Huff to transfer all rights, title, and interests in and to certain leases, which the judgment specified by reference to the actual lease documents from a trial exhibit that Appellants offered. *See Hogg,* 622 A.2d at 652 ("[T]he only duty of the constructive trustee is to transfer the property to the equitable owner."); *see also Pick v. Bartel,* 659 S.W.2d 636, 637 (Tex.1983) (noting judgments satisfy statute of frauds by including property description or "by reference to other identified writings"). The lease documents provide that the lessors may not unreasonably withhold their consent to Riley–Huff s assignment of in-

terests or that Riley–Huff may assign its interest without the lessors' consent.

I would also overrule Appellants' "tracing" issues. Because the jury found Riley–Huff wrongfully acquired Eagle Ford leases "as a result of" Huff and D'Angelo's breach, and D'Angelo admitted Riley–Huff and Longview were both trying to "get into Eagle Ford shale and acquire leases," the only relevant factual question the jury did not answer was, "What are the interests in Eagle Ford leases that Riley–Huff acquired in trying to 'get into Eagle Ford shale and acquire leases'?" The trial court admitted Appellants binders of leases that they represented were leases Riley–Huff acquired in the Eagle Ford shale. Counsel for Riley–Huff confirmed at oral argument "everything that Riley–Huff owned or at one time may have owned or had a part of is in those binders" and the binders were offered at trial to show that of all the leases Riley–Huff purchased, none were inside Longview's claimed "corporate opportunity." There was no dispute at trial, nor is there a dispute here on appeal, as to what interests in Eagle Ford leases Riley–Huff acquired in competing with Longview in trying to "get into Eagle Ford shale and acquire leases." Because jury findings are necessary only when material facts are disputed, I would overrule these issues. *See DiGiuseppe v. Lawler,* 269 S.W.3d 588, 596 (Tex.2008).

Appellants repeatedly emphasize that the windfall to Longview is "astounding" and the constructive trust is likely the largest imposed in Texas history. But context matters. In the corporate context, Delaware courts recognize the "sound public policy that it is better to give a windfall to a beneficiary than to let a faithless fiduciary benefit from his wrongdoing." *See Bomarko, Inc. v. Int'l Telecharge, Inc.,* 794 A.2d 1161, 1190 (Del.Ch. 1999), *aff'd,* 766 A.2d 437 (Del.2000) (citing

*Thorpe,* 676 A.2d at 445; *Guth,* 5 A.2d at 510). Appellants cite no authority that the size of a constructive trust necessarily affects its propriety. That the constructive trust might be the largest in Texas history, alone, shows nothing more than Huff and D'Angelo potentially committed the most profitable breach of fiduciary duty in Texas history. *See Guth,* 5 A.2d at 510 (explaining a constructive trust under Delaware law should disgorge all profits obtained as a result of a corporate breach of fiduciary duty).

## VI

### CONCLUSION

I would affirm the liability of Huff, D'Angelo, and Riley–Huff, but reverse the constructive trust and $95.5 million awards. I would remand the case for the trial court to reconsider an appropriate remedy in light of Riley–Huff s entitlement to reimbursement for its development costs. *See Drury Sw., Inc. v. Louie Ledeaux # 1, Inc.,* 350 S.W.3d 287, 293–94 (Tex.App.—San Antonio 2011, pet. denied) (noting trial court should award prevailing party the greatest and most favorable relief supported by the record).[10]

Patricia O. Alvarez, Justice, concurring and dissenting.

Because I agree with the majority's reasoning as to the insufficiency of the evidence to support the jury's findings on Usurpation of Corporate Opportunity, Jury Question Number One, I concur with only that section of the majority's opinion. I do not, however, concur with the majority's judgment. Instead, I agree with the dissent's conclusion that liability is based on the jury's answers regarding Competition, Jury Question Number Two. I, there-

fore, join the dissent on Jury Question Number Two and its assessment of available remedies to be determined by the trial court.

---

10. Because the trial court could properly exercise its discretion to award a constructive trust if the case were remanded, I do not address the *lis pendens* issue.